No. 2884.

WILLIAM TESTARD v. The State.

1. Practice—Evidence.—The defendant's application for a continuance based upon the absence of one Hensley, an alleged material witness, was refused by the trial court before the organization of the jury. The cause proceeding to trial, the trial court permitted two State's witnesses to testify that they had made diligent inquiry in the county of the forum for the alleged absent witness, but that they could find no person who had ever known, seen or heard of such person as Hensley. *Held*, that such evidence was irregular, but, in the absence of a showing that the jurors who tried the case were apprised of the application for continuance, or that such evidence was in any wise calculated to prejudice the accused, its admission was not reversible error.

2. Same.—Trial courts are invested with discretion to admit evidence at any stage of a trial before the conclusion of argument, and the exercise of such discretion will be revised on appeal only when such discretion has been abused to the prejudice of the accused.

3. Same—Dying Declarations—Predicate.—As a predicate for the introduction in evidence of the dying declarations of the deceased, the State proved that deceased was conscious and sane when he made them; that he knew his speedy death was inevitable, and that he made the said declarations voluntarily, and not in reply to questions calculated to lead him to make any particular statement. *Held*, that the predicate was sufficient to admit the declarations in evidence as dying declarations, being made immediately after the shooting. Moreover, the statements were res gestæ.

3. New Trial—Misconduct of the Jury will not necessitate the award of a new trial, unless it be made to appear that it resulted in injury to the rights of the accused.

4. Same—Continuance.—The refusal of a continuance will not require the award of a new trial when, in the light of the proof on the trial, the absent testimony set forth in the application for continuance does not appear probably true.

5. Murder—Fact Case.—See the statement of the case for evidence *held* sufficient to support a conviction for murder of the second degree.

Appeal from the District Court of Gonzales. Tried below before the Hon. George McCormick.

This conviction was in the second degree for the murder of Lewis Hunter, in Gonzales county, Texas, on the second day of July, 1888. The penalty assessed against the appellant was a term of twenty-two years in the penitentiary.

W. M. Atkinson was the first witness for the State. He testified that, at about ten o'clock on the night of Monday, July 2, 1888, when he had pulled off his coat and shoes and was preparing to go to bed, he heard two shots fired at a point in a northerly direction from his residence in the town of Gonzales. Between the two shots he heard a cry of distress, and the exclamation: "O, Lordy!" Witness at once put his shoes on and ran towards Morris & Guardien's livery stable, the direction in which the shots were fired. Near the northeast corner of the block on which he lived, where two streets intersect, the witness found Lewis Hunter lying on the ground, groaning. He was lying in the cross street, about twenty yards from the corner of the block. Witness asked Hunter what was the matter with him, and he replied: "I am shot." Witness then asked who shot him, and he replied: "Will Testard." Witness then asked him why Testard shot him, and he replied: "For nothing." Witness then asked him what he was doing at the time, and he replied: "I was lying on my cot in front of the stable, and Will Testard came to where I was lying, took a chair by the cot and said: 'I ought to kill you.' I then told Testard that I had no arms, and that I would tell Mr. Morris. Testard then shot me, and I broke and ran for Mr. Morris, and Testard fired at me again, but did not hit me." Witness then asked him again why Testard shot him, and he replied: "About my cousin." Witness then asked him the name of his cousin, but he made no reply. This conversation took place within five minutes after the shots were fired. He was sane and conscious at the time he made the statement, and was then well aware of the fact that he would die. He made the statement voluntarily, and not in answer to any question that was calculated to lead him to make any particular statement. The distance from the point where the body lay to Morris's livery stable was about one hundred and forty yards. Morris's house and the witness's house were on the same block, Morris occupying the northeast corner and that of the witness the southeast corner of the said block. Several parties were present when the deceased made the said statement to the witness. Sheriff Jones and one or two other parties were at the body when witness reached it.

W. L. Guardien testified, for the State, that he was a junior member of the firm of Morris & Guardien, proprietors of the livery stable in Gonzales, Texas, at which the deceased worked at the time of his death, and near which he was shot. Witness be-

came a member of that firm about eight months before this trial, at which time he found the deceased employed at the stable as a hostler. At the time deceased was shot, the witness was standing in front of Dilworth's bank, on the public square. He heard the first shot, and looked towards his stable, whence, from the sound, he thought it was fired, and saw the flash of the second shot. He then ran to the stable through park square, opening two gates. He found nobody at the stable. He then called Lewis Hunter, but received no answer. He then seized the lighted lantern, which was in the stable office, and ran with it through the stable, but found nobody, either on the inside or outside of the building. He returned to the front of the stable and met Deputy Sheriffs Hanson and Campbell. With the said deputies, the witness made a diligent search among the stalls and buggies, and, while prosecuting that search, Mr. Morris came to the stable, and said that Lewis Hunter was lying at the corner of his yard fence, shot. Witness and the deputies then went to the point indicated, and found Hunter on the ground, suffering from a gun shot wound. Nobody was with Hunter when witness got to him. Witness asked him at once what was the matter. He replied "Will Testard shot me." Witness then asked if he got into a difficulty with Testard, and he replied in the negative, and added: "He shot me about my cousin." Witness then asked him when he was was shot, and he replied: "I had just fixed for bed; had laid down on my cot at the stable, when Testard came up to where I was and began to curse me, and said: 'I ought to kill you.' I told Testard that I had nothing—not even a pocket knife— and that I would go and tell Mr. Morris. I then started to get up from the cot and Testard shot me. I then hallooed and ran towards Mr. Morris's house, and Testard shot at me again but missed me." The witness then asked him if anybody but himself and Testard was about the stable when the shots were fired, and he replied that no other person was there.

Among the first things said by Hunter after witness reached him was his repeated declaration that he would die, and his request, as frequently made, that his wife should be sent for. He was sane and conscious, but was suffering a great deal. He made his statement voluntarily, and not in answer to questions calculated to call out any particular statement. Mr. Atkinson was not with Hunter when witness reached him, but arrived soon afterwards. The witness did not hear the statement made to

Atkinson by deceased. The Blue Front saloon was on the opposite side of the street from witness's stable, about twenty-five or thirty steps distant. It was north of the stable and fronted east. Morris's house was south of the stable about one hundred and forty varas distant. A person sitting at the front of the Blue Front saloon could plainly see the front of the stable. The stable street lamp was not lit when witness reached the stable after the shooting. Witness examined Hunter's cot as soon as he got to the stable. It was standing on the platform scales in front of the stable. There was a quilt on it, the condition of which showed that the cot had been recently occupied. A pair of shoes were sitting on the scales under the edge of the cot. There was no pillow on the cot, nor was there a pistol about it. The witness never knew nor heard of a man in Gonzales county named Hensley. Captain W. E. Jones reached the deceased soon after the witness did. Deceased was shot about ten o'clock on the night of July 2, 1888, and died about two o'clock p. m. on the next day.

C. J. Morris, the senior member of the livery stable firm of Morris & Guardien, testified, for the State, that his residence was situated on the block adjoining that on which the livery stable was situated. The witness left the stable and went home about thirty minutes before the shooting occurred. He was undressing to go to bed when the shots were fired. He heard the halloo of somebody immediately after he heard the first report, and very soon after the second shot was fired he heard somebody at his fence calling him. Recognizing the voice as that of the deceased, the witness ran out of his house and found the deceased lying on the street running east and west, about twenty feet from the northeast corner of the fence. Witness's house and livery stable fronted east on the same street which stretched north and south at right angles to the street on which Lewis Hunter was lying. Witness reached the deceased between two and three minutes after the shots were fired, and immediately asked him what was the matter. He replied: "Will Testard shot me." Witness then asked him why Testard shot him, and he replied: "For nothing;" and said something about his cousin. Before making these statements, which he did voluntarily, and not in reply to questions calculated to elicit any particular statements, the deceased, who was sane and conscious, said repeatedly that he would die. As soon as Hunter finished the statement thus detailed, the witness ran up

the street to his stable, where he met his partner, Guardien, and others, and told them that deceased was at the corner of his fence, badly wounded. The deceased, who had worked for witness for two years, slept at the stable. It was the recollection of the witness that, when he went home from the stable on that night, he left the deceased lying on his cot, which was on the platform scales in front of the stable. The witness never saw the deceased have a pistol in his possession at any time, and was confident that if he had ever had one about the stable he, witness, would have seen it at some time. Witness's habit was to be the last person to leave his stable at night, and he was generally the first person to reach it in the morning, nearly always waking the deceased. The shooting occurred on the night of Monday, July 2, 1888. Witness went to the stable early on Sunday morning and waked the deceased. While at the stable at that time Testard and McHenry came to the stable to get a hack. The stable was about one hundred and twenty-five yards from the house of the witness. The said stable did not stand square with the street, but fronted the corner. Willie Withers, another of witness's hostlers, a negro boy, was putting up a horse when witness left the stable about thirty minutes before the shooting. The stable street lamp which stood on the corner was burning when the witness left, and it lighted up the entire front of the stable and the platform scales on which deceased's cot was standing. No pistols were kept about the stable at any time, except on occasions when travelers would leave them there for safe keeping. Witness was unable to say whether or not a certain Mr. Bell had a horse in the stable that night.

W. M. Hanson, deputy sheriff of Gonzales county, testified, for the State, that he and Deputy Sheriff Campbell were sitting in Dave Hertzfeld's saloon between nine and ten o'clock on the night of July 2, 1888, when they heard two shots fired at or near Morris & Guardien's livery stable. They ran immediately down the street to the corner of the Blue Front saloon, and thence a short distance towards the river, but then turned and went direct to the stable, where they found Mr. Guardien. While searching the stable premises with Guardien, Morris came to the stable and reported that Lewis Hunter had been shot, and was lying in the street near the northeast corner of his home fence. Witness and Campbell went to the place where the deceased was, and met Sheriff Jones who sent them

and A. H. Jones to the house of old man Testard, the father of the defendant, to arrest defendant. Witness and A. H. Jones went to the front of the house, and Campbell to the rear. The witness then went into the house and asked the ladies whom he found there to give him a lamp. Just as the witness entered the second room the defendant stepped into the door, and witness ordered him to surrender. Witness and A. H. Jones then arrested and disarmed defendant, and took him to jail. Defendant's pistol, which witness examined about twenty minutes after he got it, contained two freshly exploded cartridge shells. The witness saw no stranger about the stable just after the shooting. He had never seen, known or heard of a man in Gonzales county named Hensley. District court convened on July 2, 1888, the day of the shooting, and there were a large number of people in town. Defendant was not drunk when he was arrested, but appeared to have been drinking. Deputy Sheriff Campbell testified for the State substantially as Hanson did.

A. H. Jones, marshal of the town of Gonzales, testified for the State, that he was with Hanson when defendant was arrested, and received defendant's pistol from Hanson at that time. That pistol contained two empty shells which had been recently exploded. Another chamber was entirely empty, and the remaining three were loaded. Defendant was somewhat under the influence of liquor when arrested, but was not drunk. The witness was well acquainted in Gonzales, but had never known nor heard of a man named Hensley. He made diligent but unsuccessful search for such man.

W. E. Jones, sheriff of Gonzales county, Texas, testified, for the State, that he reached the corner of Morris's residence fence, near which Hunter was lying wounded, within five minutes after he heard the two shots. Hunter told witness that he was shot and was going to die. He was then sane and conscious. Witness asked him no questions calculated to draw out any particular statement. Hunter then made to witness about the same statement testified to by the witness Guardien. He did not mention the name of the cousin of whom he spoke, but from what witness afterward learned, he supposed Hunter referred to the colored girl, Amy. Hunter said that nobody but himself and defendant were at or about the stable at the time of the shooting. While the witness was with Hunter at the corner of Morris's fence, old man Testard, the father of the de-

fendant, came there, kneeled down by Hunter and attempted to talk to.him, but witness made him go away. Old man Testard insisted that he should be permitted to ask Hunter some questions, but witness made him get up and leave. Witness went to the jail about twenty-five minutes after the arrest of the defendant, and then saw him. He had his wits about him then and was not drunk. The pistol then shown to the witness as the one recently taken from the defendant contained three loaded chambers, two recently exploded shells, and an empty chamber. Witness had a very large and very general acquaintance in Gonzales county. He had never known nor heard of a man in that county named Hensley. He made diligent search and inquiry for such man, but found no person who knew or had ever seen or heard of him.

Marcos Dilworth testified, for the State, that he was in the Blue Front on the night of July 2, 1888, and there met with the defendant, whom he had known about ten years ago, but whom he did not recognize at first. While he and defendant were talking at the door of the saloon, they saw a negro woman on the opposite side of the street, going towards the livery stable. The defendant proposed that he and witness "run down that coon." About that time two negro girls, coming from the direction of the stable, met the woman first mentioned, and the three walked off together up the street, the witness and defendant behind them. Defendant made some remark to witness about the girls, and they turned and ran back to the stable. A few minutes later the women returned in company with a negro man. Witness heard the negro say: "I will protect you," speaking to the girls, but heard nothing else said by him. He said nothing to defendant that the witness heard. The negroes passed on, and defendant, who was somewhat in advance of witness, came back and said to him: "Let's go and round up them coons." Witness replied: "To hell with your coons." Defendant then said: "That nigger called me a pale faced son of a bitch," or a "pale faced man"—witness was not now certain which. He, witness, did not hear the negro make any such remark. Witness left defendant, and about thirty minutes later heard the shots fired. He was then at the southeast corner of the square. The defendant was not drunk when witness left him, but was drinking.

Amy Hall was the next witness for the State. She testified that she went to the place of defendant's father on the night of

the shooting, to return an ironing board she had borrowed from a woman who lived on that place. She started back home about nine o'clock on that night, another girl being in company with her. They met Amelia White near the corner of the livery stable, and the three started in company to go to the house of the witness. Defendant and another man followed the party, and when they had approached quite near, the defendant said to the other man: "Don't you touch the girl in the middle"—referring to Amelia White. He then said something to witness and her companions, and they turned at once and ran back to the stable, and told Lewis Hunter that two men were after them, and asked him to see them home. · Hunter assented, got up, and, remarking that it was "strange that colored women could not walk the streets without being interfered with by white men," started home with witness and the other women. They passed the defendant and the other man, but nobody uttered a word. Defendant said nothing to deceased, nor did deceased say anything to defendant. Deceased said nothing about the incident after starting more than "I will protect you." He did not at any time use the words "son of a bitch," or "pale faced son of a bitch." When the men first accosted the witness and her friends, Testard tried to get them to "go off" with him and his friend; instead of doing which they ran back to Hunter at the stable. Lewis Hunter was in no way related to the witness, and if he ever called her "cousin" she did not know it. Hunter left the witness and her friends at the corner of the fence at witness's house, and, about thirty minutes later, the witness heard the two shots.

Will Bell testified, for the State, that he reached Gonzales about nine o'clock on the night of July 2, 1888. He put his horse in Morris & Guardien's stable, and while at the stable he observed a cot sitting on the platform scales in front of the stable. He then went across the street to the Blue Front saloon, and took a drink. Defendant was then in the saloon drinking, but not drunk. Witness then found a seat on the outside of the saloon at the south door of the same, facing the front of the livery stable. McHenry was then sitting in the same door, facing the witness, and with the stable at his back. A short time before the shooting the defendant went into the saloon at the door at which witness was sitting. Within a very short time he went out of the saloon at that door, and walked directly across the street to the livery stable. He went to a

point very near the cot and said something to a man who was lying on the cot, which the witness did not understand. The man on the cot then got up and started off, and the defendant fired the first shot at him. The man hallooed and ran off towards Morris's house, and the defendant fired a second shot at him as he fled. The parties were in full view of the witness, and if the witness's life depended on the statement he would unhesitatingly say that the man was moving away from defendant when defendant fired the first shot. After firing the second shot the defendant crossed the street and jumped the fence into his father's yard. The defendant was drinking but was not drunk at the time of the shooting. About the time the second shot was fired the witness left the saloon and went to the corner of the stable, from which point he saw the defendant jump into his father's back yard. He then returned to his former place at the saloon door, and a few minutes later the officers passed, going to the stable. Witness could and did see plainly all that transpired at the stable at the time of the shooting, and he knew as a fact that there was no person about the front of the stable at that time but the defendant and the man whom he shot at.

The State closed its testimony by introducing the following diagram of the vicinity of the shooting:

Statement of the case.

J. S. McHenry was the first witness for the defense. He testified that he, defendant, Joe Peck and others, having organized a fishing excursion for Sunday, the day before the shooting, he and defendant went to Morris & Guardien's stable early on that Sunday morning to get a hack and team. Deceased was lying on his cot, awake, when they reached the stable—the cot then standing on the scales in front of the stable. Deceased got up, and when he went to take his bed clothes from the cot into the stable, the witness saw a revolver lying between the pillow and the cot. Deceased took that pistol from where it was, put it among the bed clothes and carried the bundle into the stable. Mr. Morris was not then at the stable, or, if he was, the witness did not see him. The party went fishing, taking along a supply of provisions, whisky and beer. As a result of that excursion, the defendant got very drunk that day. The party returned to town late that evening. The witness drank a great deal during that day, but did not get drunk. On the night of the next day, when the fatal shots were fired, the witness was at the Blue Front saloon. He was sitting at the south door of that saloon, which was the door nearest the stable. Will Bell was sitting at the same door, north of the witness. The witness saw the defendant go into the said saloon a few minutes before the shots were fired, but did not see him go out of the saloon. Witness heard the shots, but did not see who fired them, nor what or whom they were fired at. Just after the first shot was fired somebody exclaimed: "O, Lordy!" Bell asked: "What is that?" Witness replied: "Oh, it's nothing but some of the boys firing off their pistols." Bell and witness then went to the corner of the block, stood there a few minutes, and then went to the corner of Morris's fence where Hunter was lying. Bell did not leave the bar room door alone, just after the two shots were fired, and then come back. He did not leave that door until he and the witness left it together, and they went first to the corner of the block, and then to the deceased. Witness was not drunk at that time. He drank no whisky in a bar room on that day, and but one drink elsewhere. Witness boarded at the house of old man Testard.

Barney Monroe testified, for the defense, that he worked at Morris & Guardien's stable for a short time, about six weeks before this trial. On one occasion, while at the said stable, he saw a nickel plated pistol on the office shelf. The deceased claimed it, and told the witness that it belonged to him.

The mother and two sisters of the defendant testified that they were present when the defendant was arrested, and that he was then very drunk. Mrs. Testard stated that the effect of whisky, in large quantities, on the mind of defendant was to craze him.

The defense closed.

W. E. Jones, in rebuttal, testified, for the State, that he first saw the defendant on the night of the shooting, about thirty minutes after it occurred. He was not drunk. He was somewhat under the influence of liquor, but not enough so to cloud his wits or to interfere with his locomotion.

A. H. Jones testified, for the State, in rebuttal, that defendant and McHenry were both quite drunk about eleven o'clock on the morning of the day of the shooting—so drunk that witness told them to go off the streets and get some sleep, or he would have to arrest them. Defendant was somewhat drunk when arrested on that night, but not near so drunk as he was in the morning. Witness saw McHenry just after the shooting. He was then drunk, but not so drunk as he was in the morning.

Will Bell testified, for the State, in rebuttal of McHenry, that McHenry took two drinks of whisky with him in the Blue Front saloon, within fifteen minutes, before the shots were fired. McHenry was full. When the two shots were fired, witness remarked to McHenry: "Somebody is shot." McHenry replied: "Oh, no, it's only some of the boys firing off their pistols." Just after the last shot was fired, the witness walked off alone towards the livery stable, and back to where McHenry was.

Morris, recalled, testified, for the State, that he went to his stable about five o'clock on the morning of the fatal day, and waked the deceased. He was there when McHenry and defendant came after the hack. He could not say that they had not been there before on that morning. Deceased may have had a pistol about the stable, but the witness never heard of nor saw it. Guardien testified that he had never known deceased to have a pistol about the stable.

Joe Peck testified, for the State in rebuttal, that he went to the stable early on Sunday morning to see about getting a hack to go on the fishing excursion. McHenry, defendant and Mr. Morris were then at the stable. Deceased's cot was then sitting inside the stable. The stable hands, including the deceased, were feeding the stock.

The witnesses concurred in stating that, when shot, the deceased had on no shoes, nor coat, and only his shirt and ducking pants. No fire arm was found about his person or cot. A. H. Jones and Guardien testified that they were acquainted with the reputation of the defense witness J. S. McHenry for truth and veracity, and that it was bad.

The motion for new trial raised the questions discussed in the opinion.

*Phelps & Lane* filed an able brief and argument for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. While it was irregular and improper to admit the testimony on the trial before the jury in relation to one William Hensley, it is not made to appear by the defendant's bill of exception to this action of the court, or otherwise, that said testimony prejudiced, or might probably have prejudiced or injured the defendant in any way. It is not made to appear that the jury or any one of them had any knowledge of defendant's application for a continuance based upon the ground of the absence of said Hensley, or even that any of the jurors knew that said Hensley was desired by defendant as a witness in his behalf. Said application for continuance was disposed of by the court before the jury was impaneled, and a reasonable presumption would be that the jurors who tried the case had no knowledge whatever of said application, or of said Hensley, or his connection with the case. If it had been made to appear that the jurors, or any of them, had knowledge of said application, then indeed the testimony in regard to said Hensley might have impressed the minds of the jury prejudicially to the defendant, and its admission would have been material error. But, in the absence of any showing that any one of the jury had such knowledge, we can not perceive any material error in the admission of said testimony.

II. Wisely, we think, the law vests a trial judge with a broad discretion in keeping open the door for the admission of competent and legal evidence until the argument of the cause has been concluded, and also to direct and control the introduction of evidence and the examination of witnesses. Before this court will revise the action and rulings of a trial judge in such

matters, and pronounce the same erroneous, it must clearly appear to us that the trial judge has abused the discretion confided to him by law, and that thereby the defendant has probably suffered injury to his legal rights. No such abuse of discretion is shown by defendant's bills of exception six and seven.

III. There was no error committed in admitting the testimony proving the declarations of the deceased. These declarations were admissible as dying declarations, the 'roper predicate for their admission having been fully estab 'shed. We believe furthermore that they were admissible as res gestæ.

IV. No good and sufficient ground for a new trial was shown and the court did not err in refusing defendant's mot on for a new trial. It is well settled that misconduct of a jury is not ground for a new trial unless it is shown to have been such as affected the fairness and impartiality of the trial. (Jack v. The State, 20 Texas Ct. App., 656; Allen v. The State, 17 Texas Ct. App., 637; McDonald v. The State, 15 Texas Ct. App., 493.) No such misconduct on the part of the jury in this case has been made to appear. Refusing defendant's application for a continuance or postponement of the cause does not present good ground for a new trial, because the facts as stated in said application, considered in connection with evidence adduced on the trial, do not appear to be probably true. (Code Crim. Proc., art. 560; Melton v. The State, 24 Texas Ct. App., 47; Parker v. The State, Id., 61; Henning v. The State, Id., 315.)

There is no question as to the sufficiency of the evidence to sustain the conviction. In fact, the evidence would warrant a conviction for murder in the first degree, which doubtless would have been the verdict of the jury had it not been for the fact that at the time the defendant committed the homicide he was intoxicated. No complaint is made of the charge of the court, and we have found no error in it.

The judgment is affirmed.

*Affirmed.*

Opinion delivered October 27, 1888.