[No. 2385.]

JAMES BRADBERRY *v.* THE STATE.

1. ASSAULT TO MURDER—INDICTMENT—CASE OBSOLETE.—To an indictment for assault with intent to murder it was objected that it was insufficient, because it failed to allege that the pistol used in the commission of the offense was charged, and that it failed to allege otherwise the present ability of the accused to inflict an injury. *Held,* that the objection is not sound, and that the doctrine so announced in Robinson's case, 31 Texas, 171, if ever the law in this State, is now obsolete. See the statement of the case for the charging part of an indictment which, conforming to number 357 of Willson's Criminal Forms, is *held* sufficient to charge the offense of assault with intent to murder.

2. PRACTICE—EVIDENCE.—Whether or not the statements of a defendant made shortly after the commission of the criminal act are admissible in his behalf as part of the *res gestae* depends upon whether or not they are necessary incidents of the transaction; necessary in the sense that they are part of the immediate concomitants or conditions of such act, and are not produced by the calculated policy of the actor. To be admissible as *res gestae,* the declarations must stand in immediate causal relation to the act, and become part either of the action immediately producing it, or of action which it immediately produces. In this case it was shown that the witness by whom the defendant proposed to prove his declarations was two hundred yards distant when the difficulty occurred; that he went to the place of the difficulty after it was over, and asked the defendant what was the matter; that the defendant told him to catch his horse first and he would tell him; that he accordingly caught the defendant's horse, occupying about three minutes of time in doing so, when the defendant made the statement proposed to be introduced in evidence. *Held,* that the statements so made by the defendant were no part of the *res gestae,* under the rule announced, and were properly excluded.

3. SAME.—A SPECIAL CHARGE is properly refused when its substance, in so far as it is correct, is embodied in the general charge.

APPEAL from the District Court of Hunt. Tried below before the Hon. J. A. B. Putman.

A term of two years in the penitentiary was assessed against the appellant upon his conviction for assault with intent to murder, under an indictment the charging point of which reads as follows:

\* \* \* \* " ....at James Bradberry, late of the county of Hunt and State of Texas, did, with force and arms, in the county of

Hunt and State of Texas, on the sixth day of March, A. D. 1886, with his malice aforethought, make an assault in and upon the person of one K. C. Hart, with a certain pistol, the same being a deadly weapon, with the intent then and there to kill and murder him, the said K. C. Hart, against the peace and dignity of the State."

K. C. Hart was the first witness for the State. He testified that he lived about eight miles south of Greenville, in Hunt county, Texas. He went to a neighbor's house on the sixth day of March, 1886, after some potatoes. Returning home with the bag of potatoes before him on his saddle, the witness met the defendant and C. W. Bradberry and James Reed. The parties all stopped and a conversation ensued, each person taking a drink of whisky from a flask produced by C. W. Bradberry. The talk finished, defendant told C. W. Bradberry and Reed to ride on, as he wanted to see witness privately. After C. W. Bradberry and Reed got off some distance, defendant pulled off a glove, placed his hand behind him, and said: " I understand that you say you will not pay me what you owe me." Witness replied that he owed the defendant nothing. Defendant then drew his pistol, pointed it at the witness, not more than two feet from witness's face, and said: " G—d d—n you, I came here to kill you, and I am going to do it." Witness told defendant that he was unarmed, and asked him not to shoot. Defendant's horse was then standing south of witness's horse, with his head towards witness's horse's tail. Defendant dismounted on the side of his horse opposite the witness, passed around the head of his horse to the rear of the witness's horse, keeping witness covered all of the time with his pistol. Witness turned in his saddle and watched defendant, but did nothing else. Defendant finally ordered witness to throw up his hands. Witness refused to do so and the defendant fired, missing witness, but nearly blinding one of his eyes with powder. Defendant then fired his second shot, striking the witness in the right shoulder. Witness fell from his horse, and, as he got up, defendant fired at him again. Witness then got his pistol out of his saddle bags. Defendant then started to run and witness fired at him. Defendant fell, got up, and started at witness again. The defendant fired twice at the witness as he fled. Witness fired a second shot at defendant, when he fell, exclaiming that he was killed. The sun was about an hour high when all of this occurred.

There was no ill feeling existing between the witness and de-

fendant, so far as the witness knew, at the time. Witness had been told that defendant had threatened to whip him. All parties appeared perfectly friendly when they first met in the road just before the shooting. The witness had sold the defendant a pair of mules on short credit, for which the defendant never paid. The witness, a few days before the shooting, learned that defendant was preparing to remove to Collin county, and told defendant that he must pay for or return the mules before he left. Witness took the mules back, and defendant claimed that witness owed him for their care and feed. Witness denied that he owed defendant anything, and maintained that their work while in his possession was more than fair compensation for their feed. The witness saw Bud Lawson at Gibson's house shortly after the shooting. Witness went to town, and, after hearing that the defendant was not killed, filed a complaint against him, and he was arrested on that same night. Witness's pistol was a larger weapon than the defendant's.

A. E. Gibson testified, for the State, that he witnessed the shooting from a distance of three or four hundred yards. Witness first saw Hart in the road on his horse. He then heard three pistol shots and saw Hart either jump or fall from his horse. He then saw a man on the ground east of Hart. The first three shots were fired from a point beyond Hart from where witness was. One of the pistols in the affray was larger than the other, and the witness supposed, from the motions of the men and the sounds and smoke, that Hart had the large pistol. Hart fired his first shot after he had fallen or jumped from his horse and got up. The witness was going home from Mr. Wood's house, on the outside and along the east string of fence around his twenty-six acre enclosure. The shooting occurred just beyond the west string of the same fence, and to see it the witness had to look across the field and over or through the two strings of fence. The witness was absolutely positive that the first shots were fired from a point east of Hart.

Bud Lawson testified, for the State, that on Friday week before the shooting the defendant and Jeff Bradberry were at the house of the witness's mother. On that occasion the defendant asked the witness if K. C. Hart was at home. He said that Hart was owing him for keeping some mules and that he had heard that Hart had said that he did not intend to pay him, and that if he did not pay him he would whip it out of him if he ever got him away from the house. The witness heard the

shooting, being then at home, about six hundred yards from the place where the shooting occurred. Witness went to Gibson's house shortly after the shooting and found Hart there. Witness went with Hart to Greenville on that night and Hart filed a complaint against the defendant.

Elizabeth Gibson testified, for the State, that she was on her way home from Mr. Woods's with her husband when the shooting occurred. Three shots were fired before the witness looked in the direction whence they sounded. She then saw the men, one of them running. Up to that time witness could discern no difference in the sounds of the shots. The two subsequent shots sounded louder than the three first ones. Witness did not know which of the two men fired the first three shots, nor which of them fired the last two. The State rested.

C. W. Bradberry was the first witness for the defense. He testified that he was with his brother, the defendant, on the day of the difficulty, when they met K. C. Hart. James Reed was with witness and defendant. Before meeting Hart the defendant stopped at Hart's house to see him about some money Hart owed him. Defendant overtook witness and Reed, and shortly the party met Hart in the road. All of the parties stopped and talked for some time, the witness treating the crowd from a flask of whisky he had with him. Having treated, witness proposed to his companions to go, when Hart said that he wanted to see the defendant. Reed and witness rode on, leaving Hart and defendant talking. The witness met said defendant at Bulger Wilkerson's house, where he overtook witness and Reed. He said that he was shot in the hip. Witness asked him who shot him and he replied that K. C. Hart did. Witness examined his hip wound and found it to be a very severe one, and summoned a doctor to dress it. The sheriff came and arrested the defendant on the same night, and took him to town next morning in a wagon. The witness had never heard his brother, the defendant, utter an unfriendly word against Hart.

James Reed testified, for the defense, that, going home from Greenville on the evening of the shooting, he overtook the defendant and C. W. Bradberry, and rode with them. Defendant stopped at Hart's house, to see Hart, he said, about five dollars that Hart owed him. He said that Hart had promised to pay the amount to Gibson, and that Gibson had written to him that Hart had refused to pay. Defendant soon overtook witness and C. W. Bradberry, who did not stop at Hart's, and they then,

traveling together, soon met Hart in the road. All parties stopped, took a drink together from C. W. Bradberry's bottle, and talked for some time in a perfectly friendly manner. Witness and C. W. Bradberry started on, and defendant said that he would soon overtake them. Witness could not recall whether it was the defendant or Hart that asked the other for a private interview.

Frank Haselfield testified, for the defense, that he lived about two hundred yards from the scene of the shooting. Witness was at home and heard the shooting, and went to the scene immediately. No one but the defendant was on the ground when witness reached it. He called witness to him and said that he was badly shot. Witness asked him who shot him, and he replied that K. C. Hart did. He then asked witness to get his horse, about fifty yards off. It took witness about three minutes to catch the horse.

The motion for new trial raised the questions discussed in the opinion.

*Montrose & Grubbs,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This indictment, which is for assault with intent to murder, is assailed as insufficient because it does not aver that the pistol—the weapon alleged to have been used in the commission of the offense—was charged, nor does it otherwise allege that defendant had a present ability to inflict an injury. In support of this position we are cited to Robinson v. The State, 31 Texas, 171. That opinion does sustain the position, it is true, but no authority is cited in support of the opinion, and if the doctrine therein enunciated ever was the law it has long since ceased to be so in this State. The indictment is in conformity with the later decisions and approved forms in this State. (See Wilson's Crim. Forms, Form 357, p. 161, and authorities cited, and especially Montgomery v. The State, 4 Texas Ct. App., 140, and Payne v. The State, 5 Texas Ct. App., 35; 2 Bish. Cr. Proc., 3d ed., sec. 77.)

A bill of exceptions was reserved to the ruling of the court in refusing to permit the witness Haselfield to give in evidence the statements made to him by defendant with regard to the

difficulty, which statements, it is insisted, were *res gestæ* and admissible. Haselfield lived some two hundred yards from the place where the difficulty occurred, heard the firing ; after it ceased he went to the place, saw defendant hobbling around, and asked him "what was the matter." "Defendant told witness to catch his (defendant's) horse and bring it to him, and he would tell him all about it. He caught defendant's horse and took it to him, which occupied about three minutes;" and defendant then made the statements to him about the difficulty which were excluded.

Were the statements *res gestæ ?* "There are no limits of time within which the *res gestæ* can be arbitrarily confined. They vary, in fact, with each particular case. * * * The distinguishing feature of declarations of this class is that they should be the necessary incidents of the litigated act ; necessary in this sense, that they are part of the immediate concomitants or conditions of such act, and are not produced by the calculated policy of the actors. They need not be coincident as to time, if they are generated by an excited feeling which extends without break or let down from the moment of the event they illustrate. In other words, they must stand in immediate causal relation to the act and become part either of the action immediately producing it or of action which it immediately produces." (Whart. Cr. Evid., 8 ed., secs. 262, 263.) The test is, were the declarations the facts talking through the party or the party's talk about the facts ? *Instinctiveness* is the requisite, and when this obtains the declarations are admissible." (Id., sec. 691.)

Were the statements of defendant to Haselfield spontaneous, instinctive, generated by excited feeling ? We think not. When asked to tell about the matter he does not do it, seems to be thinking more about catching his horse than anything else, and only agrees or promises to tell witness if he will first catch his horse and fetch it to him ; and he does not tell him until he has done so, and that, too, after the lapse of about three minutes. This looks very much like a "break or let down" in the continuity of the transaction. In his apparently cool condition and freedom from excitement, the three minutes' time might have afforded defendant ample opportunity to concoct the statement which was afterwards made to the witness. We are of opinion the court did not err in holding that the declarations were self serving and consequently inadmissible.

An exception was taken to the refusal of the court to give in

charge the special requested instruction asked by defendant. In so far as the same presented a correct enunciation of law, it was covered by and embraced in the general charge, and, therefore, it was not error to refuse it.

No reversible error has been made to appear in the record of this conviction; wherefore the judgment is affirmed.

*Affirmed.*

Opinion delivered November 13, 1886.

