### G. M. PORTERFIELD V. THE STATE.

No. 1446.  Decided December 20, 1911.

**1.—Aggravated Assault—Charge of Court—Withdrawing Charge—Intent.**

Where, upon trial of aggravated assault, the State relied upon testimony showing lascivious and indecent conduct and contact by defendant toward prosecutrix, and the defendant's testimony showed that he had no intention or purpose in any way of inflicting injury, either of body or mind, but that he simply awakened the prosecutrix, who was a nurse, to go to her patient, it was reversible error to refuse defendant's special instructions upon this phase of the case; especially after submitting this issue and then withdrawing the charge submitting it.

**2.—Same—Evidence—Res Gestae—Narration of Facts.**

Upon trial of aggravated assault, the prosecutrix' testimony, with reference to her statement of defendant's conduct, made some time after the occurrence, not sufficiently close to be res gestae or a spontaneous statement, but simply a narration of a past occurrence, was inadmissible.

Appeal from the County Court of Wood.  Tried below before the Hon. R. M. Smith.

Appeal from a conviction of aggravated assault; penalty, a fine of $100 and thirty days confinement in the county jail.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of aggravated assault, his punishment being assessed at a fine of $100 and thirty days imprisonment in the county jail.

The assault was charged to have been committed upon Miss Ruby Maynor.  The evidence shows that Mr. Ashberry had been seriously hurt, and Miss Maynor seems to have been a trained nurse, at least, she was nursing him, and had been sitting up a great deal at night. Paralysis followed the injury to Mr. Ashberry, and it required the services of two persons to handle him when he was moved.  On the night of the alleged assault, the defendant and Mr. Culberson were sitting up with Mr. Ashberry in the early part of the night.  About one o'clock or little after, Mr. Culberson was going home, and appellant also purposed leaving Ashberry's residence.  Miss Maynor was asleep at the time in the dining room.  She had theretofore been sleeping in another room upstairs opposite the room of Mrs. Ashberry's.  About the time appellant and Mr. Culberson decided to leave, appellant went

to the door of Mrs. Ashberry's room and informed her of that fact, and it was desired to wake Miss Maynor. Mrs. Ashberry notified appellant where she was sleeping downstairs, and he went to that room for the purpose of waking her. Miss Maynor testifies when appellant awaked her and at the time she became awakened, he had her face between his hands and was kissing her. Some little conversation occurred with reference to the patient and giving the medicine, etc., and as he started to leave her bed he slapped her on the hip and remarked he "would come back directly and get it." Appellant remained at the house a while. Miss Maynor got up, dressed and went in the room where the parties were, and there was some conversation had between them with reference to the medicine, and appellant and Culberson informed her that they had forgotten to give the strychnine at the proper time, and instead of giving it at 12 o'clock, under directions, they did not give it until about 1 o'clock. She informed them that made no difference. Miss Maynor further testified that appellant went through the dining room into the kitchen while she was dressing, or about the time she had finished dressing, but said nothing. This is a sufficient statement of the State's side of the case. Appellant's statement with reference to the conversation between himself and Mrs. Ashberry is practically the same as her testimony. He went to the door of the room where Miss Maynor was sleeping and knocked several times, but did not succeed in arousing her. He opened the door, went near the bed and succeeded in awaking her to a semiconscious state, and began talking with her about Mr. Ashberry, and the manner in which they had administered the medicine, but believing she was only half awake and not understanding what he said, he put his hand on her head and shook her sufficiently to wake her up completely, and he then talked with her a little while, and thinking she had been up so much and was quite sleepy and worn out, he told her to lie down and go to sleep again, and she did lie down, and pulled the cover back over her and he went out; that he did not kiss her, or undertake to kiss, and did not slap her on the hip and make the remark she imputed to him. Culberson's testimony is practically the same as that of appellant, except as to what occurred in the room where Miss Maynor was; about these occurrences he knew nothing. There are quite a lot of details elicited on direct and cross-examination of the witnesses, but for the disposition of this case we think this is a sufficient statement.

1. Several exceptions were reserved to the charge given by the court, and also in reference to the refusal of special instructions submitted by appellant. As the case was submitted to the jury, we are of opinion that the exceptions to the court's charge are well taken, especially in view of the refusal to give the requested instructions, and the further fact that the court gave one of the requested instructions, and then withdrew it from the jury, at the same time instructing them not to consider appellant's defenses set forth in the withdrawn charge. It is not the purpose of this opinion to go into a review of the

court's charge, in view of what we have to say in regard to the error of the court in refusing the special charges.

2.     Under the facts stated, it will be observed that appellant raised the question as to his purpose in going into the room where the young lady was asleep, which was for the purpose of waking her, and that he only placed his hands on her head and shook her in order to wake her up so that he might intelligently inform her why he was waking her and announce the fact that he and Culberson were going to leave the place, to the end that she might get up and assume her duties as nurse. These charges bring clearly in review appellant's theory of the case, and that he not only did not do what Miss Maynor charged him with doing, but he also had no intention or purpose in any way of inflicting injury either of body or mind, or bringing to her any sense of shame. We deem it unnecessary to repeat these charges. They sufficiently and intelligently embodied appellant's defense, and in a correct and legal form.

3.     Illustrative of this view of the case, the court gave the following instruction asked by appellant, which he subsequently withdrew from the jury: "If you find that defendant entered the room of Miss Ruby Maynor on the night of the 29th of December, 1910, for the purpose of waking the said Miss Maynor up, and if you find that he placed his hands upon the head of Miss Maynor and shook the said Miss Maynor for the purpose of waking her up, then you will find the defendant not guilty." This charge was read to the jury as a part of the law of the case, but after reading it, the court withdrew the same from the consideration of the jury, and instructed them not to consider it, and he did not permit the jury to carry said special charge to their room in their retirement for consideration of their verdict. Objections were urged to this both in regard to withdrawing the charge, and also the court's instruction to the jury not to consider the charge as read, as well as his action in refusing to permit the jury to carry the charge with them while deliberating upon the case. Some of the other special charges which were refused went further and submitted directly the intent of appellant in connection with appellant's testimony and his theory of the case, which were refused. All this was error on the part of the court. Appellant had the legal right to have his theory of the case presented to the jury for their consideration, and if that body should believe his testimony, then appellant was entitled to an acquittal under his testimony. He testified positively that he only put his hand on her head and shook her a little in order to arouse her to the end that she might resume her duties as the employed nurse for Mr. Ashberry, the injured party, as he and the other attendants were going to leave, and Mr. Ashberry should have some one sitting up with him, and that he had no purpose or intent in doing what he did of making an assault upon the young lady or in any way to interfere with her or injure her feeling. The action of the court in reading the charge to the jury, withdrawing it, and then instructing them not to consider it,

was tantamount to an instruction to them that there was nothing in appellant's theory, and they should not consider it. It left the case in much worse condition before the jury than if he had declined giving the charge and had not read same to them. It impressed them with the fact that the court did not believe appellant's testimony, and decided that issue against appellant by the course of conduct pursued in submitting and then withdrawing the charge, and instructing them not to consider it.

4. While Mrs. Ashberry was testifying in behalf of the State, and after Miss Maynor had testified that it was about 10 minutes from the time the defendant woke her up, kissing her until she had dressed and reached the room where Mrs. Ashberry was sleeping, and after she had testified that she waited at said room door for Mrs. Ashberry to wake Joe Ashberry up and for Joe Ashberry to put on his clothes and come out of said room, and after she had testified that it was ten or fifteen minutes from the time she first called Mrs. Ashberry until she was in the room where Mrs. Ashberry was, and after she had testified that she had gone into the room where Mrs. Ashberry was sleeping, and thrown herself down across the bed and began to cry, and after she had testified that Mrs. Ashberry had asked her what was the matter, is Mr. Ashberry dead, and after she had testified that she made no reply, and after she had testified that Mrs. Ashberry asked her if Mr. Ashberry was worse, and she made no reply, and after she had testified that Mrs. Ashberry had asked her if she had heard bad news from home, and what was the matter with her, she then told Mrs. Ashberry that "Old Porterfield had woke her up kissing her." The county attorney asked Mrs. Ashberry if Miss Maynor told her anything when she reached the room where she was, at which juncture counsel for defendant requested the retirement of the jury, which was granted, and the jury retired. Then the following occurred. "Question: Did Miss Maynor tell you anything when she first came into the room? Answer: She did not. She called at my room door for Joe Ashberry and asked him to get up and sit up. I woke Joe up and as soon as he had dressed, he left the room. Just as he left the room, Miss Maynor came in. She fell down across me on the bed and began crying. I asked her what was the matter, is Mr. Ashberry dead? She did not answer me. I again asked her what is the matter, is Mr. Ashberry worse? She did not answer me. I then asked her what is the matter, have you heard bad news from home, and she said, 'Oh, Ashberry, my heart is like lead.' I again asked her what is the matter, and she said, 'Old Porterfield woke me up kissing me.' It was about twenty or twenty-five minutes from the time Mr. Porterfield woke me up until Miss Maynor came into my room." Quite a lot of objections were urged to this testimony, which present the question in almost every conceivable way from the standpoint of objection. The jury was then brought in, and this testimony elicited before them over these objections of appellant. We are of opinion that this evidence should have

been excluded. It was not of that spontaneous character authorized to be introduced as res gestae, but it was drawn from Miss Maynor after repeated questions about several matters, and it took several questions to elicit the matter from her. It was rather a narration of the past occurrences after several questions, and not the spontaneous outcry or statement which it takes to constitute res gestae. It was also after dressing and carrying on conversation at the door in regard to getting Joe ready to sit up with his father, and after the occurrences in her bed-room after appellant awoke her. Time is not always the controlling element in matters of this sort, but spontaneity is the controlling question. That, we think, is absent from this testimony as is evidenced by her conduct, at least at the door of Mrs. Ashberry's room, and the manner of the conversation with reference to arousing young Ashberry and the conversation that occurred between Mrs. Ashberry and Miss Maynor in regard to those matters. The emotions and agitations of Miss Maynor seem to have occurred after she entered the room of Mrs. Ashberry. She gave no evidence of these matters until after she had entered the room, and then it required several questions to elicit the matter that was disturbing her. We mention this so that upon another trial this testimony may not be placed before the jury.

Under this condition of the record, this judgment should be reversed and the cause remanded, and it is accordingly so ordered.

*Reversed and remanded.*