C. E. HEIDINGSFELDER, SR., V. THE STATE.

No. 17172.   Delivered February 13, 1935.
Rehearing Denied April 10, 1035.
Second Rehearing Denied April 17, 1935.

The opinion states the case.

*C. F. Stevens, A. E. Heidingsfelder, H. G. Hart,* and *C. E. Heidingsfelder, Jr.,* all of Houston, for appellant.

*D. B. Wood,* District Attorney, of Georgetown, *K. C. Barkley,* Criminal District Attorney, of Houston, *Wilcox & Graves,* Special Counsel, of Georgetown, *Percy Foreman,* Assistant Criminal District Attorney, of Houston, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is embezzlement; the punishment, confinement in the penitentiary for ten years.

The trial was had in Williamson County on a change of venue from Harris County.

Appellant was engaged in the practice of law in the City of Houston, where he had known Mrs. Elizabeth Adele Pipkin about twenty-two years. Prior to her marriage, Mrs. Pipkin had lived in the home of appellant and his wife. When domestic trouble arose between Mrs. Pipkin and her husband, she employed appellant to represent her in securing a divorce; and gave him a power of attorney of date August 2, 1933, constituting him her agent to collect and receive for her $40,000 in cash in the division of the community property between herself and husband. At that time her part of said property was being held in escrow by an official of the American National Bank of Beaumont, who was to deliver same to appellant upon presentation of the power of attorney and a certified copy of the divorce decree. Pending the divorce proceedings, Mrs. Pipkin had gone to New York, where she remained during the time the transaction alleged to constitute embezzlement occurred.

On the 8th of December, 1933, appellant appeared at the American National Bank of Beaumont with his power of attorney and a certified copy of a decree granting Mrs. Pipkin a divorce. Upon presentation of the instruments mentioned to the escrow agent, appellant ostensibly read from a letter from Mrs. Pipkin from New York directing him to deposit $5,000 of the money held in escrow in said American National Bank, and to send her $500 in New York exchange; and instructing him further to withdraw $34,500 in cash in order that he might carry said amount with him to Houston for the purpose of having it available for investments he had discussed with Mr.

Meyers of the Houston National Bank. Appellant was finally prevailed upon to take a cashier's check for $34,500 instead of cash, said check being made payable to appellant, as trustee for Elizabeth Adele Pipkin. Appellant had at no time discussed the question of making investments for Mrs. Pipkin with Mr. Meyer.

On the 9th of December, 1933, appellant went to the First National Bank of Houston and presented the cashier's check for $34,500, with the request that he be given a New York exchange draft for said amount. He was advised that it would be necessary to collect the check before issuing the draft. After collecting said check the First National Bank of Houston executed a New York draft for the amount of $34,500. On December 13, 1933, appellant returned to the bank and was tendered said draft. He thereupon advised the officials that he desired to receive the full amount in cash, as he had been instructed by Mrs. Pipkin to come to New York with the money, and that he would leave for New York on the following day. When the bank declined to comply with appellant's request, he demanded another cashier's check from the American National Bank of Beaumont. The draft was thereupon canceled, and a new cashier's check was obtained from the Beaumont bank, which was delivered to appellant on the 15th of December, 1933.

On the date last mentioned appellant deposited the cashier's check for $34,500 in the Houston National Bank to the credit of himself, as trustee. At the time of making this deposit he had in the account mentioned 78 cents. On Saturday, the 23rd of December, 1923, shortly before the bank closed, appellant communicated by telephone with one of the officials of the Houston National Bank and advised him that he desired to withdraw 345 bills of the denomination of $100. Shortly thereafter appellant went to the bank and informed the official that he wanted the money delivered to him where he could not be seen. He was taken to the vault, and upon receiving the money, placed it in his shirt. He stated at the time that he had a guard awaiting him upstairs. After receiving the money, appellant and the guard left through the back door of the bank. After the withdrawal of the money appellant had 78 cents left in his account. Prior to the time of said withdrawal Mrs. Pipkin had directed appellant to send her New York exchange checks for the amount of money due her in order that she might deposit same in New York banks. Thereafter apppellant wired Mrs. Pipkin he would bring the money to New York in

person. She replied by wire on December 24, 1933, to the effect that it was unnecessary for him to make the trip, and instructed him to send drafts for the total amount due her.

Appellant has failed to account to Mrs. Pipkin for $34,500. On the 26th day of February, 1934, he paid Mrs. Hettie Alexander seventeen $100 bills, he having theretofore borrowed $1,700 from her. On the same date he presented to the bank twenty-five $100 bills, for which he had a cashier's check issued to Mrs. Alexander, as guardian of her minor children, it appearing that he owed said minors approximately $2,500.

Adverting to the division of the community property between Mrs. Pipkin and her husband, Mrs. Pipkin testified that she had been desirous, and had so advised appellant, of receiving half of her property in stock of the Humble Oil and Refining Company. Appellant advised her to take the full amount in cash in view of the fact that the stock might decline. Mr. Pipkin had theretofore advised appellant that he would underwrite the Humble Oil & Refining Company's stock to the end that if it declined his wife would not lose, with the understanding that if it advanced the profit would be hers. Appellant declined to accept said terms.

The statement hereinbefore set forth embraces in substance the testimony adduced by the State.

Appellant did not testify. One of his witnesses gave testimony to the effect that he heard appellant state to Mrs. Pipkin that he had been robbed and all of her money taken. His testimony was to the further effect that appellant offered to pay Mrs. Pipkin one hundred dollars a month and deed her certain property. Other of appellant's witnesses testified that they were called to appellant's office on the night of December 25, 1933, and found appellant and his son C. E. Heidingsfelder, Jr., there. Appellant was lying on the floor. There was a whisky bottle near him. His face was flushed and he appeared to be weak and nervous. At times he cried. The safe door was open. One of appellant's witnesses testified to having escorted appellant from the Houston National Bank on December 23rd to the vicinity of appellant's office, that is, to the tenth floor of the building. He did not go with appellant to his office.

It appears from bills of exception 1 and 1-A that appellant called in question the legality of the order of the district court of Harris County in ordering a change of venue to Williamson County. Appellant predicated his application for a change of venue upon the ground that his case had been given great publicity in the newspapers of the city of Houston resulting in

prejudice against him and his case being created. It was prayed in the application that the venue be changed to some county not subject to the same objection. Upon the issue being joined, the trial court heard evidence and reached the conclusion that the venue should be changed. Upon the evidence heard the court found, and embraced such finding in the order changing the venue, that all of the adjoining counties were subject to the same objection as was Harris County. We think the finding was supported by the evidence, and that the court's action should be sustained under the terms of article 565, C. C. P., which provides: "Upon the grant of a change of venue, the cause shall be removed to some adjoining county, the court house of which is nearest to the court house of the county where the prosecution is pending, *unless it be made to appear to the satisfaction of the court that such nearest county is subject to some objection sufficient to authorize a change of venue in the first instance.*" (Italics ours). Under the circumstances, the opinion is expressed that the court was warranted in changing the venue to Williamson County. See Seaton v. State, 29 S. W. (2d) 375.

Bill of exception No. 2 is concerned with the refusal of the trial court to either postpone the trial or continue it until the next term of court. It was alleged in the application that appellant had employed as leading counsel the Honorable J. F. Taulbee of the Georgetown Bar to represent him; that in a former trial said attorney had appeared and represented him; but that due to illness he was unable to appear during the present trial. The fact that the Honorable J. F. Taulbee was ill was in no manner controverted. The other attorneys representing appellant were members of the Houston Bar. In qualifying the bill of exception, the trial judge, among other things, certified that the testimony heard was to the effect that the Honorable J. F. Taulbee would have been unable to participate in the trial for a month. The bill is further qualified, as follows: "The trial court further certifies that defendant himself is a lawyer of ability and of some 30 years experience in the active trial of criminal cases and that he actively participated in the trial of this cause. In addition, there were three other able and competent attorneys present in court in the trial of this case and actively participated therein, all of which actively and ably participated in the previous trial of defendant on the charge in this court and were entirely familiar with the issues of the case, fact as well as legal, and that said attorneys

ably and actively represented defendant during the entire trial of this cause."

We think the holding in Caraway v. State, 263 S. W., 1063, is controlling. There the appellant had two attorneys whom he had previously employed. One of them was absent for business reasons at the time of the trial. The other, a skillful and experienced lawyer, was present and faithfully represented the appellant during the trial. It was held that in refusing to postpone the trial the court was not in error. From Branch's Annotated Penal Code, sec. 342, the following is taken: "A judgment will not ordinarily be reversed because of the refusal of the court to postpone or continue the case on account of the absence of leading counsel where the record shows that associate counsel ably represented defendant." See Monroe v. State, 119 S. W., 1146.

Bills of exception 20 to 22, both inclusive, relate to the refusal of the trial court to permit appellant to prove by several witnesses that he stated to them in his office on December 25, 1933, that an unknown man had robbed him of the $34,500 he was holding for Mrs. Pipkin. For example, it is stated in one of the bills of exception that the testitmony the witness would give touching appellant's condition and declarations would be as follows: "I saw him on December 25th, 1933, in his office, 10th floor, Marine Bank Building, Houston, about 7:00 or 7:15 that night. Defendant's son, Charles Jr., called me to come to his father's office and I got there in 5 or 6 minutes and I saw defendant when I arrived. He was sitting in a chair and his son was bathing his head with pieces of ice. Mr. Hill, Office Manager, was also present. Yes, I saw Mr. O'Callaghan—he runs the elevator. Defendant's son was bathing his face. Mr. Manint, Assistant District Attorney, was also present. Mr. Williams and Crawford came later. Defendant's son was bathing defendant's face and trying to get him to talk. Defendant was sitting in a chair with his head kind of wobbly, was mumbling and crying at times. Defendant's son told him that I and Manint was there and to tell what happened and every once in a while he would mumble and cry and move his head and point sorter to the safe which was to his right. So after about 15 or 20 minutes we shook him and slapped his face and pulled him and talked to him a good deal and finally I asked him to come to the front of the safe and tell us what this was about. Defendant's son and I assisted him by his arms. When he sat down his appearance was all right. When he was wobbling his head we couldn't arouse him for the time being—he was in a

stupor. He then said, when we got him in front of the safe, that he had been robbed and said he received a call at his home from somebody about 3 p. m. calling from the Rice Hotel, a man wanted to see him at his office about 5:30 p. m. That he got to his office a little ahead of time and sat in his reception room and read a paper—Daily Court Review, and while reading looked down the hall towards the elevator and saw a man coming from towards the door by elevator to his office. He said the man came in and asked if that was Mr. Heidingsfelder and defendant said yes, and the man said yes, and the man said 'I'm the party that called you from the Rice Hotel,' and defendant said when the man said this, the man pulled a pistol and shoved it in his side, cursed him and told him to go into his office and told him to open the safe and defendant told him he didn't know the combination and the man said 'You have some money in the safe,' and defendant said 'I haven't,' and the man cursed him some more and he sat down and tried to open the safe and didn't and the man told him to take a drink and he told him he didn't drink and the man insisted and he took one and tried to open the safe. He said he only tried one time to open the safe after he had a drink and that he opened it and put the money up on the safe and the man made him drink again the rest of the whisky in the bottle and after that he stood by him and in a few seconds he went blank and he said the man robbed him of $34,500.00 and described the man as about 40 years old, weight about 170 lbs., and about my height—5 ft. 10 in., and a heavy mustache, a heavy upper lip, and a defect in his left eye. He said the money was 345 $100.00 bills and said the money belonged to a lady in New York City. Later he said Mrs. Adele Pipkin. He said he drew the money out of the bank Saturday, 23rd December, and brought it to his office and put it in his safe. He said he got Arch Spradley, plain clothes police officer from the police station, to meet him at the bank and had him accompany him to his office as protection. He said he got the money from the Houston National Bank, the bank got the money from the Federal Reserve Bank. He asked me to go to the bank and get the numbers of the bills and try to catch the robber and stop him from spending the money. I tried next day to get the numbers of the bills but was unable to get them. Defendant said he was going to take the money to New York to the lady. Showed me a pass to go to New York on and he said he wired the lady in New York. Defendant's tie had been cut on one side and slipped down. I told him who was in the

office as I wanted to arouse him and find out what had happened."

As to appellant's condition, one of the bills recites that the elevator man who operated the elevator in the office building where appellant was located testified that he went into appellant's office about 7 p. m., December 25, 1933, after being called by appellant's son, C. E. Heidingsfelder, Jr.; that appellant was lying on the floor on his back "frothing at the mouth," and had urinated in his pants; that the safe was open; that he and appellant's son picked appellant up, placed him in a chair and washed his face with ice and cold water; that appellant was crying; that his son slapped him in the face in an effort to arouse him; that appellant appeared to be in a stupor as he was being aroused. Illustrative of the qualifications appended to said bills of exception by the trial court, we quote the following:

"The occasion about which defendant's counsel sought to have witness Payne testify was approximately 55 hours after the money had been taken from the bank by defendant with, according to the State's theory of the case, the intent to embezzle the money. It was likewise more than two days before the defendant was arrested on a grand jury indictment. Therefore, according to the record in the case, it was neither res gestae of the offense as relied upon by the State's case nor res gestae of the arrest.

"Witness Payne testified that Charles E. Heidingsfelder, Jr., was there when he got there. Witness O'Callaghan says that Charles E. Heidingsfelder, Jr., was the first person to defendant at the time and on the occasion about which Payne's testimony is excluded. However, Charles E. Heidingsfelder, Jr., is not offered as a witness.

"The court cannot certify that 'witness would have testifield if permitted that defendant stated at the very time he came out of his unconscious condition that he had been robbed by an armed robber unknown to him and that the $34,500 he was robbed of was the property of Mrs. Adele Pipkin' for the reason that the questioning and cross-examination of said witness Payne during the absence of the jury showed that he could not swear that defendant was actually in a 'stupor,' nor that he was not 'opposoming;' said witness having testified that he did not see any blood or broken places on or about the said defendant, and that said defendant told a coherent story and talked intelligently and seemed to be in possession of his faculties and seemed to be entirely recovered, and was not suffering any pain and that defendant at the time he

was telling the story of what had happened to him appeared cool, calm and collected."

Appellant insists that the declarations hereinbefore set forth were admissible under the rule of res gestae. Looking to the qualification to the bills of exception, it is observed that it is certified that the testimony of the witness was to the effect that, when he made the declarations, appellant told a coherent story, seemed to be in possession of all of his faculties, appeared to be entirely recovered, and further, appeared to be cool, calm and collected. In view of this qualification, it is unnecessary to determine whether the State's position that the embezzlement was consummated on December 23, 1933, and that hence the declarations could under no circumstances be admissible as res gestae, is tenable. In Underhill on Criminal Evidence, Third Edition, sec. 163, it is said: "It is absolutely impossible to lay down any rule which would be applicable in criminal cases generally to determine whether a declaration is or is not a part of the res gestae. Some crimes, such as murder and rape, often consist of a single isolated act on the part of the active participant, occupying but a very small portion of time from its inception to its consummation; while other crimes, as a conspiracy to defraud or to obtain money by false pretenses, consists of a series of connected facts and incidents spread over a considerable portion of time, some of which may be innocent in themselves, but all of which lead up to, and terminate in, the criminal transaction which is the principal fact."

We quote from Branch's Annotated Penal Code, sec. 83, as follows:

"If the acts and declarations appear to spring out of the transaction, if they elucidate it, if they are voluntary and spontaneous, and if they are made at a time so near it as reasonably to preclude the idea of deliberate design, then they are to be regarded as contemporaneous, and are admissible. Lewis v. State, 29 Texas App., 204, 15 S. W., 642; Craig v. State, 30 Texas App., 621, 18 S. W., 297; Hobbs v. State, 16 Texas App., 521; Castillo v. State, 31 Texas Crim. Rep., 152, 19 S. W., 892; Griffin v. State, 40 Texas Crim. Rep., 314, 50 S. W., 366; Rainer v. State, 148 S. W., 735; Davis v. State, 154 S. W., 552; Ward v. State, 159 S. W., 276.

"The test is, were the declarations the facts talking through the party, or the party's talk about the facts? Instinctiveness is the requisite. Bradberry v. State, 22 Texas App., 278; 2 S. W., 592; Bronson v. State, 59 Texas Crim Rep., 17, 127 S. W.,

177; Porterfield v. State, 141 S. W., 968; Rainer v. State, 148 S. W., 735."

If it should be conceded (and it is not conceded) that the declarations of appellant would have been a part of the res gestae if shown to have been voluntary and spontaneous, it is observed that the qualification to which reference has been made places said declarations in the category of a detailed statement lacking spontaneity and instinctiveness.

We next consider whether such declarations should be held admissible under article 728, C. C. P., the pertinent provision of which we quote as follows: "When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence."

The State contented itself with introducing the transaction claimed to constitute embezzlement, and introduced no detailed act or declaration on the part of appellant concerning the alleged robbery. Under the circumstances, we think the holding of this court in Gibson v. State, 5 S. W., 314, which was approved in Lawler v. State, 9 S. W. (2d) 259, militates against the conclusion that article 728, supra, supportes the admissibility of the declarations mentioned, and we are constrained to hold that they are shown to be self-serving. We quote from Gibson's Case as follows: "Now, it is contended by counsel for appellant that, under the rule laid down in Greene's Case, 17 Tex. App., 395, and followed in the Harrison Case, 20 Tex. App., 387, these declarations to George Cook were admissible; that those cases are strictly in point; and, for this court to sustain the ruling of the court below in this case, the Greene and Harrison Cases must be overruled. The Greene Case alone discusses this question, and we are very certain that there is no analogy between that and this case. But let us look to the statute. The latter part of article 751 of the Code of Criminal Procedure is relied upon to support the admissibility of these declarations. That clause reads: 'And when a detailed act, declaration, conversation, or writing is given in evidence, any other act, declaration, or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence.' It is not pretended by appellant that the proposed statements were res gestae, but that they are admissible by virtue of the above statute. In the Greene Case there was no witness of the homicide. The State relied upon the voluntary confession of the accused made to a justice of the peace on the evening of the homicide. By reference to the confession introduced by the State, it will be

seen that it is strictly a declaration detailing the particulars of the homicide, though not so full and complete as to be beyond a more perfect explanation, in order that it might be fully understood. In the case in hand the State did not introduce in evidence a detailed declaration, a detailed conversation, or acts of the defendant. It confined the witnesses to the remarks and acts of the participants as they were made and occurred at the very time of the transaction, constituting strictly res gestae; the transaction was simply introduced as it actually occurred,—as it spoke through the acts and words of the parties engaged. If the position of the appellant be correct, in all cases in which the State introduces in evidence a remark or act of the accused, though made and done at the very time the offense is committed, the accused would have the right to introduce any and all statements made by him at any subsequent time. To such a doctrine this court cannot consent."

Bill of exception No. 25 presents the following occurrence: On the 20th of March, 1934, at the instance of appellant, a subpoena was issued for one A. L. Anglin of Houston County, and executed on the 21st of March. The trial began on March 19, 1934, and the testimony was concluded during the morning of March 23rd, at which time both sides announced that they closed. The trial judge had prepared his charge. About 1:30 p. m. on the date last mentioned the witness Anglin appeared in the courtroom just prior to the time that the judge read his charge. Thereupon, appellant requested permission to place said witness on the stand. The court retired the jury, and, in their absence, had the witness testify under oath. On his direct examination by appellant's counsel said witness testified that he did not know appellant and was not acquainted with any of the lawyers in the case; that he had never been to appellant's office in Houston and did not know where it was; that he had not talked to any of counsel for appellant until his arrival in Georgetown; that he arrived after the case had closed; that he then stated to appellant's counsel that he had gone upon the ninth floor of the Marine Building (the building in which appellant had his office in Houston) about 6 p. m. on Christmas day, 1933, to see one Langston Smith; that Smith was not in and he walked upstairs to the tenth floor; that when he reached the tenth floor a man ran into him and kept going; that this man said nothing to him; that instead of taking the elevator the man went downstairs. Upon being cross-examined by the district attorney, the witness testified that he had been in Georgetown during a former trial of appellant, and had remained there

two days at the Sherman Hotel; that he did not talk to appellant or any of his attorneys during the time; that prior to the former trial he had told one Ratcliff about having seen a man on the tenth floor of the Marine Building; that after making this statement to Ratcliff he had gone to Houston, where he saw Ratcliff and Meek Hawkins, who was one of appellant's attorneys at the former trial; that he did not tell Mr. Hawkins what he knew about the case. Being further cross-examined on the question as to whether he told Mr. Hawkins about the matter, the witness finally admitted that he stated to Mr. Hawkins that he had seen a man on Christmas day, 1933, on the tenth floor of the Marine Building, and that this man bumped into him. According to his version of the matter, it was after he had made this statement to Mr. Hawkins that appellant's first trial was held in Georgetown. The witness testified further that he came to Georgetown at his own expense, where he remained two days during the former trial; that during said trial he saw none of appellant's attorneys, although Mr. Hawkins was present. Touching his presence in the Marine Building on the occasion in question, the witness testified that he went there for the purpose of seeing Langston Smith about an oil lease; that he went to the ninth floor in the elevator; that he did not find Langston Smith; that he then walked upstairs to the tenth floor, where he went to a toilet; that as he reached the tenth floor a man about six feet tall ran into him; that he did not know whether this man was in shirt sleeves or had on a coat. Again he testified that he had never been on the ninth floor of the Marine Building before; that he knew where Mr. Smith's office was, but did not remember how he found out; that he did not notice any name on the door of said office; that he did not remember the number of the office; that in his best judgment when he went up in the elevator it was being operated by a girl. The proof before the jury was to the effect that on the occasion in question, the elevator was operated by a man. We deem it unnecessary to set out in further detail the testimony the witness gave in the absence of the jury. The court declined to permit the case to be reopened. It is shown in the bill of exception that all of the witnesses in the case had theretofore been excused.

Article 643, C. C. P., provides that the court shall allow testimony to be introduced at any time before the argument is concluded if it appear that it is necessary to a due administration of justice. In construing said article, this court has declined to reverse cases for the refusal of the court to reopen the case and

permit the introduction of further testimony unless it has appeared that under all of the circumstances, the appellant, without fault on his part, had been prejudiced by such refusal. See Elsworth v. State, 104 S. W., 903; Crawford v. State, 288 S. W., 213, and authorities cited. In Dement v. State, 45 S. W., 917, we said: "It is a matter very much in the discretion of the court to admit testimony after the evidence has been closed; and, unless the refusal of the court to allow such testimony is shown to be prejudicial, a case will not be reversed on that account."

From Testard v. State, 9 S. W., 888, we take the following: "Before this court will revise the action and rulings of a trial judge in such matters, and pronounce the same erroneous, it must clearly appear to us that the trial judge has abused the discretion confided to him by law, and that thereby the defendant has probably suffered injury to his legal rights."

In Treadway v. State, 1 Tex. App., 668, the following is quoted with approval: "It is believed that the discretion thus confided to the district court was intended not to be a subject of revision by the appellate court, unless it be made to appear that the discretion has been abused to defeat the ends of justice."

The decisions are to the further effect that if there is no reason to believe that the evidence proposed to be offered was of a character to materially change the state of the case favorably for the accused, as it then stood before the jury, it will not be held that there was an abuse of discretion in declining to reopen the case. Treadway v. State, supra; Meredith v. State, 40 Texas, 483. Giving application to the principles controlling, we are unable to reach the conclusion that an abuse of discretion is shown. Viewing the testimony of the witness in the light of the facts before the jury, we think there is no reason to believe that the evidence so proposed was of a character to change the state of the case favorably for appellant.

It is shown in bill of exception No. 26 that in his opening argument, one of counsel for the State used language as follows: "All the defendant hopes for is having another hung jury." Appellant's objection to the argument was promptly sustained and the court instructed the jury verbally, and admonished them in writing, not to consider said remarks for any purpose. From the testimony heard upon the trial, the jury were aware that there had been a former trial of appellant for the alleged embezzlement. There was nothing in the remarks of

counsel to indicate how the jury stood. We are constrained to hold that the bill of exception fails to reflect reversible error.

To discuss all the matters presented by the numerous bills of exception would unduly lengthen this opinion. A careful examination of all of appellant's contentions leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Renewed complaint is made of the action of the lower court, who granted appellant's request for a change of venue, because the court sent the case to Williamson county. We can not state the law more correctly or clearly than is done in our former opinion. Appellant asked that the venue be changed. This was done. His reasons were set out in his request. The court evidently agreed with appellant, and finding from his investigation that not only Harris county but the contiguous counties were likely to be affected by the publicity complained of, he sent the case for trial to a distant county deemed far enough away to be beyond the objectionable influences alleged by appellant. No legal objection to a trial in Williamson county was advanced. We think the part of our opinion disposing of this matter correct.

Appellant also urges that we were wrong in upholding the trial court in that he refused to continue the case because of the illness of Judge Taulbee, one of defense counsel. We have examined with interest and care the cases cited in appellant's motion, and have weighed, as best we can, the questions involved. None of the cases cited are on facts of enough similarity to be usable as precedents. If we understand appellant, his main contention is that the three able lawyers who were present during his trial and conducted same, did not have knowledge or familiarity with the jurors of Williamson county as did Judge Taulbee. The record shows that on the 14th of February, 1934, when this case was set for March 19th for trial, Judge Taulbee was then ill, and had continued so up to the last named date, and was too ill to be seen or consulted by the other attorneys in the case. That there were other attorneys in Georgetown, the county seat, and in Williamson county, whose services were

available to appellant and who knew well the jurors of the county,—is not questioned. Nor is it suggested, as in a number of cases cited by appellant, that appellant was deprived of counsel to represent him upon the trial. The Jackson case, 115 S. W., 263, from which appellant quotes extensively in his motion for rehearing, seems not at all in point. There the trial court compelled one of counsel for the accused,—said in the opinion to be the one most familiar with the case,—to be sworn as a witness, and to go and remain out of the court room under the rule during the trial, he being forbidden to talk with other witnesses, etc., etc., and we correctly held this to be an arbitrary action of sufficient injury to call for reversal. We have examined each of the other cases cited, but are still of opinion that the discretion of the trial court in the instant case was not abused in this regard.

We are next called on to consider whether we correctly decided it was not error to reject the testimony offered from witnes O'Callaghan, in effect, that on the night of December 25, 1933, at the office of appellant, to which witness had been called by appellant's son, appellant in witness' presence said repeatedly "I have been robbed." Appellant's proposition regarding this matter is that it was res gestae, and hence admissible. We have carefully examined the record to see if we can answer the query as to what this might be res gestae of. The only possible answer would be,—if we speak from the record,—res gestae of some matter or occurrence not otherwise proved or put before the jury. What was the matter, transaction or fact of which this was res gestae? When did it occur? What took place? To each of these we would be compelled to answer that we do not know. As stated in the bill of exceptions, the witness would have testified that appellant said "I have been robbed." Appellant did not testify in this case that he had been robbed of Mrs. Pipkin's money. If he had, we would have a different question. Nor did he introduce any witness to so swear either directly or circumstantially. Such statement is wholly devoid of a single circumstance identifying the robbery. The State proved that appellant drew out of a bank on December 23, 1933, 345 one hundred dollar bills, the property of Mrs. Pipkin, representing a judgment or settlement which appellant had made for her. On this trial Mrs. Pipkin swore that she had never gotten her money in any form. The State further showed by proof that in February, 1934, appellant bought a cashier's check for $2500.00, paying therefor 25 one hundred dollar bills, which the banker swore was a very unusual transaction. On another occasion about

the same time, it was shown that appellant went into said bank and gave the receiving teller $1700.00 in one hundred dollar bills. Appellant argues in his brief and motion for rehearing that the statement of the witness referred to was res gestae of his robbery by some unknown party in which Mrs. Pipkin's money was taken from him.

We adhere to our conclusion expressed in our former opinion that the statement under discussion was inadmissible. As we view the matter, the trial court was justified in holding said statement to be a self-serving declaration. Exculpatory statements of the accused, though made by him at the time of his surrender after the commission of the offense, may be self-serving and inadmissible. Allen v. State, 17 Texas App., 637. See also of such declarations made in fifteen minutes after the alleged commission of the offense, Stephens v. State, 20 Texas App., 255. See, also, Clore v. State, 26 Texas App., 624; Caldwell v. State, 12 Texas App., 302; Bradberry v. State, 22 Texas App., 273; Angus v. State, 29 Texas App., 52; Cockrell v. State, 32 Texas Crim. Rep., 585. In Pharr v. State, 10 Texas App., 487, we said: "Declarations made by a defendant in his own favor are not admissible in his behalf unless part of the res gestae, or part of a confession offered by the prosecution; or unless coming within the rule that when part of an act, declaration, etc., is given in evidence the whole may be required." We recognize that any relevant transaction, in a given case, may have its own res gestae, but certainly to make admissible anything asserted to be such res gestae, a predicate would have to be laid showing such other transaction to be in fact relevant to the case on trial.

Explanatory,—the State rested its case upon this trial without a word relating to any transaction in appellant's office December 25, 1933. Appellant put Payne on the stand, a police captain of Houston, who swore that at about 7:15 P. M. on said day he was called to appellant's office and got there in five or more minutes, and found appellant and others there. Appellant's son was bathing appellant's face. O'Callaghan, the elevator man in the building, testified he carried appellant's son up to the tenth floor about 7:10 P. M. on said date, and about the time he got back down he was called back up and asked by appellant's son to come with him to appellant's office. When they got there appellant was lying on the floor and appeared to have urinated in his pants and to be drunk. There was foam in the corners of his mouth, his neck tie was cut, a whisky bottle lay on the floor, and the safe was open. Murray, also

an elevator man in said building, testified he carried appellant up to his office about 5:20 P. M. that same day. He said appellant seemed sober. The police captain referred to was recalled and said he saw the safe open, and observed that appellant appeared to be not at himself, but that he came around while witness was there and made statements as to what had happened, which statements are not in evidence. Giving full effect to all the above, we see in same no sort of proof of a transaction relevant to the charge against appellant of the embezzlement of the money of Mrs. Pipkin. As said in our former opinion, neither appellant nor his son testified, and no predicate was laid for any tangible claim that the rejected testimony of O'Callaghan as set out in bill 22, or the rejected testimony of Mr. Payne as set out in bill 20, or the other testimony set out as rejected in bill 21,—was res gestae of any transaction shown otherwise than as above stated,—to be pertinent or relevant. In his qualification to said bills of exception the court states that officer Payne testified that while appellant was making the explanation to him of what occurred, appellant seemed to be cool, calm and collected, and narrated the matters intelligently.

We have again gone carefully over the facts expected of the witness Anglin, claimed by appellant to have been discovered by him after the testimony herein was closed, the court having declined to permit the case to be reopened in order that said witness might testify. This witness testified before the court that he had told one of appellant's attorneys before the first trial of this case all the same facts as set out by him which he would have testified to if used as a witness. It was disclosed by this witness that after telling said attorney in Houston of the facts which he proposed to testify herein, that this witness came to Georgetown, Texas, where the case was on trial, at a date previous to the instant trial; that he stayed at the same hotel where appellant and his attorneys stayed, and that he was not used or called as a witness. In addition to what we said in our former opinion in disposing of this matter, there seems also to be an entirely lack of diligence.

The remark of State's counsel complained of in bill of exceptions 26, in effect, that appellant only hoped for another hung jury, as we have already observed, was promptly stricken out and the jury told not to consider same, and we are not of opinion that such matter was of that hurtful character as to require reversal because of the remark being made in the presence of the jury. Probably every man fit for jury service knows

that a man who is acquitted can not be again tried for the same offense. It being before this jury from several legitimate sources that appellant had been tried for this offense at a former time, the men composing the jury would reasonably therefrom know that he had either been convicted and given a new trial, or that the jury had disagreed. We think there is no merit in the contention, and that the matter was properly disposed of in our former opinion. Smith v. State, 52 Tex. Crim. Rep., 344; Douglas v. State, 58 Texas Crim. Rep., 127; Watson v. State, 82 Texas Crim. Rep., 305; Alexander v. State; 84 Texas Crim. Rep., 185; Reese v. State, 87 Texas Crim Rep., 245; Barnard v. State, 87 Texas Crim. Rep., 365. Most of these cases relate to misconduct of juries, but are analogous in principle.

We have gone over each and all of the complaints set out and presented in appellant's motion, as carefully as we can, and repeat what we said in substance in our former opinion, that to discuss all of said matters would but lengthen this already long opinion without affecting the result, and without benefit to the body of the law or to the profession.

The motion for rehearing is overruled.

*Overruled.*

ON REQUEST FOR LEAVE TO FILE SECOND MOTION FOR REHEARING

HAWKINS, JUDGE.—Appellant's request for permission to file second motion for rehearing has been examined. The suggestion therein that we may have overlooked some questions presented on appeal, or in consideration of certain bills of exception, has received attention. Nothing appears to have been overlooked which could affect appellant's rights in the premises, or which would lead to a conclusion different from that already expressed in our original opinion, and in the opinion on rehearing.

The request is denied.

*Denied.*