**Ex parte Patrick F. ROGERS.**

**No. 71169.**

Court of Criminal Appeals of Texas, En Banc.

June 19, 1991.

Rehearing Overruled Sept. 18, 1991.

Michael V. Powell, William B. Steele, III, Susan L. Karamanian, Kurt A. Wimmer, A. Darby Dickerson and Thomas F. Loose Dal-

las, Eden E. Harrington, Austin, for appellant.

Tom Wells, County Atty., and Kerye Ashmore, Asst. County Atty., Paris, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

This is a post conviction application for writ of habeas corpus filed pursuant to the provisions of Art. 11.07, V.A.C.C.P.

On January 9, 1986, applicant was found guilty of the offense of capital murder. After the jury returned affirmative answers to the special issues, punishment was assessed at death. This Court affirmed applicant's conviction on direct appeal. *Rogers v. State*, 774 S.W.2d 247 (Tex.Cr.App.1989).

On January 17, 1991, this Court ordered the instant cause filed and set on applicant's first allegation. In that allegation, it is urged the jury in applicant's capital murder trial was precluded from considering mitigating evidence regarding applicant's background and character. The trial court has entered findings of fact and conclusions of law and recommended the relief sought be denied.

This Court has reviewed the record with respect to the allegation presented by applicant and finds that the findings and conclusions entered by the trial court are supported by the record and upon such basis the relief sought is denied.[1] The Stay of Execution entered by this Court on January 17, 1991, is vacated.

CLINTON, Judge, dissenting to denial of relief.

This is an application for post-conviction writ of habeas corpus brought pursuant to Article 11.07, V.A.C.C.P. Applicant was convicted of the offense of capital murder

and his punishment was assessed at death. On direct appeal this Court affirmed his conviction. *Rogers v. State*, 774 S.W.2d 247 (Tex.Cr.App.1989). We filed and set this application to address only applicant's first contention, wherein he claims Article 37.071, V.A.C.C.P., "unconstitutionally limited consideration of mitigating evidence at the sentencing phase of trial, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 13 and 19 of the Texas Constitution."

Trial occurred in January of 1986. Applicant neither objected to the trial court's charge nor requested any special instruction to ameliorate the defect he now alleges. However, under the concurring opinion in *Black v. State*, 816 S.W.2d 350 (Tex.Cr. App.1991), in which a majority of five judges joined, applicant need not have preserved this error in order to raise it on collateral attack. See also *Ex parte Goodman*, 816 S.W.2d 383 (Tex.Cr.App.1991). We therefore proceed to the merits of his claim.

In the course of what may fairly be described as a crime spree, applicant murdered a Paris police officer. Applicant and an accomplice stole a car in Oklahoma City in the early morning hours of September 21, 1985. From there they drove to Paris, stole a pistol from a pawn shop, and then robbed a Braum's ice cream shop. A short time later they were pulled over by Officer David Roberts. Applicant jumped out of the stolen car and shot Roberts through the windshield of the police cruiser. He then proceeded to the driver's side window and shot Roberts five more times. Applicant and his accomplice stole two more vehicles, assaulted a number of elderly people, and kidnapped one old man before they were eventually apprehended. See *Rogers v. State*, supra, at 251 & 257.

Evidence at both the guilt and punishment phases of trial shows applicant was an habitual user of drugs, primarily marijuana and PCP. There are strong indica-

---

1. We specifically decline to adopt conclusions of law Nos. 2, 3, and 8 entered by the trial court concerning applicant's alleged procedural default. See *Black v. State*, 816 S.W.2d 350 (Tex. Cr.App.1991). Applicant's remaining 29 allegations are denied on the basis of the findings and conclusions entered by the trial court.

tions he was under the influence of PCP when he shot Officer Roberts. He and his accomplice had shared a "hundred dollar bottle" of PCP within hours of the shooting. Eyewitnesses to the various offenses almost uniformly described applicant as, e.g., "very, very nervous," "real hyper," "hopping," "jumping up and down," "moving a lot," and "real jumpy." He is said to have been "hopping," "jumping," and even "danc[ing]" around when he fired the fatal shots into the police cruiser.

Pursuant to presenting a defense of insanity at the guilt phase of trial, applicant called Dr. Gary Byrd, a psychiatrist, to the stand. Among other things, Byrd testified as to the effects of PCP:

"Q. Can you tell us the characteristics of the drug? How does it make you feel?

A. It acts—part of the affect [sic] of it is to act as a tranquilizer and to provide a—some recreational lift of high. The other affect [sic] of it, which is less predictable and not commonly known, is that it makes the user really nutso (sic) or real crazy. Their thinking apparatus comes all to pieces.

Q. Can you tell us what are the clinically observed effects of PCP on a human body?

A. In terms of the—beyond the tranquilization or the minor lift or high that is obtained from the PCP will be—what we clinically observe in an individual is that an individual will behave or carry on their activities in an illogical manner and in a manner in which they are detached from reality and the person will act as if they are unaware of the consequences of what they do. And by that, I would exemplify that for example an aeronatuical [sic] engineer who got PCP by accident might well attempt to fly off the top of the Holiday Inn, he may take off to fly and if he survives the fall in the parking lot after the affects [sic] has [sic] worn off he would say that he logically knew that people don't fly but it just seem [sic] at the time that that was the thing to do because the roof was there and the sky was there and the cars looked nice or

that he saw the house lights. Or the little lady who is a librarian gets PCP by accident, she thinks she's taking her heart medicine and she takes her son's PCP, she may get on a Harley Davidson and open it wide open and she doesn't even drive a car fast and she will say, 'I don't know, it just seemed like the thing to do.' And you say, 'Well, do you feel that you would get harmed?' And, 'I was just going along and it was just part of the flow.' * * * PCP can, to the person, have the effect of like throwing a handful of bolts or nuts into a motor. The motor is running—like the brain being the motor—just throw it in there and all kinds of things may happen. Or it may keep running."

Answering a question that was posed pursuant to the insanity defense as to whether applicant likely understood that his conduct in killing Officer Roberts was wrong, Byrd answered, *inter alia:*

"THE WITNESS: I don't think he would know—I don't think he would have concluded one way or the other. I think that at the time of the shooting of the police car, as I understand it, that that was one in a series of, in my opinion, bizarre, detached behavourial [sic] events in which he wouldn't be aware of the consequences of the shooting of the car and wouldn't be able to assess quality to it, either good or bad or any moral quality to it."

Applicant had told Dr. Byrd during their interview that he had "shot the car."

"Q. He shot the car?

A. He shot the car.

Q. Did he tell you where he shot the car?

A. In the front windshield.

Q. Did he tell you he was aiming at anybody or anything?

A. I don't think he was or wasn't. This is part of the scenario. That's what cops and robbers do.

Q. What did he tell you?

A. He shot—

Q. He said he shot the car?

A. That's right.

* * *

Q. He never looked in the car?
A. That's correct.
Q. That's what he told you?
A. Yes."

Applicant himself testified at the punishment phase of trial. He readily admitted to the shooting, but insisted he did not know why he had done it; that he did not "even have a reason for doing it." A pervasive theme during his direct and extensive cross-examination was that he had simply not been "thinking."

By its verdict at the guilt phase of trial, the jury rejected applicant's insanity defense. This is not at all surprising, inasmuch as the record established without contradiction that applicant's ingestion of the PCP was voluntary, and the jury was instructed in accordance with V.T.C.A. Penal Code, § 8.04(a), which provides that "[v]oluntary intoxication does not constitute a defense to the commission of a crime." Applicant had tried to show he had taken PCP for the high, and was unaware of its other effects; thus his intoxication was not "voluntary." The jury almost surely found this implausible in view of applicant's long history of PCP use.

In *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978) (Plurality Opinion), a companion case to *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (Plurality Opinion), the United States Supreme Court invalidated the death sentence of a capital defendant on the basis that the Ohio capital sentencing statute then in effect did not allow independent mitigating significance to certain types of evidence proffered in those cases. One of the factors present in *Bell* but not given mitigating value under the Ohio statute was the fact that the accused "had allegedly been using mescaline on the night of the offense." U.S. at 640, S.Ct. at 2980, 57 L.Ed.2d at 1015. The underpinnings of *Lockett* and *Bell* were adopted by a majority of the Supreme Court in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

It is true that intoxication will be a relevant consideration in answering the first special issue pertaining to deliberateness.

But what the Supreme Court observed in *Penry v. Lynaugh*, 492 U.S. 302, at 322–23, 109 S.Ct. 2934, at 2949, 106 L.Ed.2d 256, at 280–81 (1989), *vis-a-vis* mental retardation, has application as well in context of intoxication:

"Penry's mental retardation was relevant to the question whether he was capable of acting 'deliberately,' but it also 'had relevance to [his] moral culpability beyond the scope of the special verdict questio[n].' *Franklin [v. Lynaugh]*, 487 U.S., [164] at 185, 101 L.Ed.2d 155, 108 S.Ct. 2320 [, 2332]. Personal culpability is not solely a function of a defendant's capacity to act 'deliberately.' A rational juror at the punishment phase of the trial could have concluded, in light of Penry's confession, that he deliberately killed Pamela Carpenter to escape detection. Because Penry was mentally retarded, however, and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, ... the same juror could also conclude that Penry was less morally 'culpable than defendants who have no such excuse,' but who acted 'deliberately' as that term is commonly understood. *California v. Brown*, 479 U.S., at 545, 93 L.Ed.2d 934, 17 [107] S.Ct. 837 (concurring opinion)."

Similarly, all "deliberateness" aside, jurors might rationally believe that the impairment of judgment and impulse control that accompanies intoxication might render an intoxicated defendant less deserving of a sentence of death than a sober man would have been.

In the charge submitted to the jury at the conclusion of the punishment phase of trial the jury was instructed, pursuant to § 8.04(b), supra, that if it found voluntary intoxication rising to the level of temporary insanity, it could "take such temporary insanity into consideration in mitigation of the penalty attached to the offense of capital murder." There are two problems with this instruction. First, a jury that has sworn to answer special issues strictly in accordance with the facts has no mechanism for implementing temporary insanity

in mitigation, unless it be to answer the deliberateness question "no." A juror might believe, however, that a capital accused was so intoxicated that he was incapable of evaluating the wrongfulness of his conduct; but that, despite his temporary insanity, he acted deliberately. The same juror might also believe that the accused was nevertheless less morally culpable than would have been a sober man committing the same offense. The juror would have no way of effectuating this last belief under the instruction given. See *Penry v. Lynaugh,* supra, 492 U.S. 302, at 322–23, 109 S.Ct. 2934, at 2949, 106 L.Ed.2d 256, at 280–81 (1989).

Second, and perhaps more importantly, this instruction does not even purport to empower the jury to give mitigating effect to evidence of voluntary intoxication that does not rise to the level of temporary insanity. A juror who believed a capital accused was not so intoxicated as to be incapable of appreciating the wrongfulness of his action might nevertheless find him less morally culpable than would have been a sober man committing the same crime. Here the juror would have no way to effectuate this belief either. Cf. *Tucker v. State,* 771 S.W.2d 523, at 534 (Tex.Cr.App. 1988) (error in giving instruction under § 8.04(b), supra, in a capital case, thereby limiting jury's consideration of intoxication as a mitigating factor to that which rises to the level of temporary insanity, was invited, since Tucker had requested that very instruction). Applicant's jury might reasonably have believed that because of impairment to his impulse control, he should not be subjected to the death penalty, even if it also believed his conduct had been deliberate. Believing his "thinking apparatus" had gone "all to pieces," the jury might have found his moral culpability less than sufficient to justify his death.

In short, that applicant was under the influence of PCP when he committed this offense, while certainly relevant to the first special issue, also has mitigating value beyond the scope of the special issues. There is also the fact of applicant's relative youth. He was 21 years old, the same age as the defendant in *Lockett v. Ohio,* supra. One of the considerations that the constitutionally deficient Ohio capital sentencing statute failed to accommodate as independent mitigation was the age of the defendant. Also, applicant personally expressed a sense of remorse from the witness stand, *viz:* "I felt sorry, man, after I realized what I had done. I ain't—that ain't me, man." While these facts are relevant to the second special issue, they, too, have other mitigating significance. Therefore, to impose the death penalty upon answers to the special issues alone would violate the Eighth Amendment. *Penry v. Lynaugh,* supra; *Gribble v. State,* 808 S.W.2d 65, 75 (Tex.Cr.App.1990).

Accordingly, the relief requested should be granted. The judgment of the trial court should be set aside, and applicant be remanded to the custody of the sheriff of Collin County to answer to the indictment in this cause. Article 44.29(c), V.A.C.C.P.

Therefore, I respectfully dissent.

BAIRD and MALONEY, JJ., join.