**Mariano Juarez ROSALES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69576.**

Court of Criminal Appeals of Texas, En Banc.

April 15, 1992.

Rehearing Denied June 24, 1992.

Michael B. Charlton (on appeal only), Houston, M. Benton Eskew, Austin, David Cunningham, John J. Herrera, Houston,

(Jose H. Rojo, Walter Boyd, Houston, of counsel), for appellant.

John B. Holmes, Jr., Dist. Atty., Kathlyn Giannaula, Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant was convicted of murder in the course of burglary, a capital offense under V.T.C.A. Penal Code, § 19.03(a)(2). In response to affirmative answers to special issues, the trial court assessed appellant's punishment at death. Article 37.071, §§ (b) and (e), V.A.C.C.P. Review of appellant's conviction by this Court is automatic. *Id.*, § (h).

This cause has been before us once before on direct appeal. See *Rosales v. State,* 748 S.W.2d 451 (Tex.Cr.App.1987). There we held, *inter alia,* that the trial court did not abuse its discretion in failing to find appellant to be an indigent for purposes of preparing a transcript for appeal. Subsequently appellant filed a post-conviction application for writ of habeas corpus under Article 11.07, V.A.C.C.P., in which he alleged his appellate counsel was ineffective in failing to obtain a transcript for appeal following the trial court's adverse ruling on his indigent status. In an unpublished opinion 769 S.W.2d 248 (Tex.Cr.App. 1989), this Court granted appellant a new appeal. The cause is now before us again, with transcript.

Counsel in the present appeal raises seven points of error. The first three pertain to the effectiveness of appellant's trial counsel and to his right to representation by counsel of his own choosing. In essence, appellant argues that the trial court erred in forcing him to trial with an attorney who had been hired by lead counsel to sit second chair, and who, appellant contends, was insufficiently familiar with the case to represent him effectively. Appellant contends the trial court should have granted his request for a continuance so that the attorney he retained to represent

him could recover from a bout of manic-depressiveness. In our view appellant was not deprived of his Sixth Amendment right to the effective assistance of counsel. Nor do we believe the trial court abused its discretion in failing to grant appellant's requested continuance.

The offense was committed on March 30, 1985. On April 1, 1985, the trial court appointed two attorneys, Candelario Elizondo and Michael Stone, to represent appellant. An indictment was filed on July 26, 1985, charging appellant with the offense. A month later, on August 29, 1985, appellant filed a motion requesting substitution of counsel. In the motion, pursuant to his "right to be represented ... by retained counsel of his choice," he requested "to be represented ... by Gerald B. Scheve and Walter Boyd," and asserted that he had retained both Scheve and Boyd to this end. The trial court granted his motion.

Jury selection began on Monday, October 14, 1985. Although Scheve was present on that day, voir dire was conducted exclusively by Boyd on appellant's behalf. On the following morning Scheve did not appear. Boyd related to the trial court that Scheve had complained of illness the day before, and Scheve's law clerk reported that Scheve was suffering an inner ear problem. With appellant's approval, Boyd again conducted the voir dire alone. Later in the afternoon a physician telephoned the trial court to corroborate the report that Scheve had an inner ear infection. At the end of the day the trial court adjourned the proceedings until the following Monday, October 21, 1985, to allow Scheve time to recuperate.

On Friday, October 18, 1985, however, a psychiatrist, Dr. Ronald Rogers, telephoned the trial court to report that Scheve was suffering from "a major depression," and would be indisposed for further proceedings for several weeks at least. Accordingly, on Monday, October 21, appellant filed a motion for continuance. In his sworn motion appellant attests:

"Gerald Scheve is my main attorney and the one I employed to represent me.

Walter Boyd, attorney, was employed by Mr. Scheve to assist Mr. Scheve. I did not know Mr. Boyd until after I had employed Mr. Scheve. I need Mr. Scheve to be with me in the selection of the jury as well as in the trial itself. My family paid Mr. Scheve to be my attorney and I personally employed him. Mr. Scheve is expected to recover in three or four weeks and be ready to resume as my attorney in the trial proceedings."

At a hearing pursuant to this motion, appellant testified that while he was "not dissatisfied" with Boyd's handling of the case up to that point, it was Scheve who "knows the facts" and whom appellant had expected "was going to present the trial[.]" Boyd conceded that "[t]he cases seem to relate that the Court can force the defendant to go to trial with one of his attorneys if the other is incapacitated."[1] But, Boyd maintained:

"This is an unusual situation. This is, first, a capital murder case, and Mr. Scheve was the primary attorney and, as [appellant] has testified to, he was the one that was responsible for it. I am really employed, I think the record reflects, and as [appellant's] testimony reflects, that I was employed to assist and to be an assistant only, but Mr. Scheve was the primary attorney as the attorney [appellant] had confidence in and there is nothing like a confidential attorney."

On the basis of appellant's right to "effective assistance of attorney of his choice," Boyd requested that appellant's motion for continuance be granted. It was denied, and voir dire continued.

Later in the afternoon of the same day, Dr. Rogers testified as to Scheve's condition. Scheve, he said, was showing signs "of what is formally considered a major depressive disorder." In 1982 Scheve had experienced a similar episode, and another, earlier one in 1964. Rogers testified it would probably take about three weeks for Scheve to begin to respond to anti-depressant medication, and "a few more weeks"

after that to return to normal. Rogers agreed with the trial court that the ability to function adequately in a courtroom would probably fall somewhere between those two points.

After Dr. Rogers testified, Boyd briefly took the stand. He testified that the afternoon of October 14, after the first full day of voir dire, was the first intimation he had had that Scheve "was sick, ill, mentally or whatever ... [A]s far as my having any notice whatsoever that Mr. Scheve would be ill and unable to attend this entire case, I just wasn't aware of it and hadn't even thought of it." On cross-examination Boyd admitted he had read the State's file. He testified:

"Q. You are familiar with the defendant's status and what he wants to do with this case?

A. Well, not as familiar as Mr. Scheve. He was the primary attorney and was supposed to develop all that for us. I am pretty familiar. I am well experienced in the trial of criminal cases but I don't know it like he does."

At this point Boyd renewed his motion for continuance, which the trial court again denied. The motion was denied a third time when, without further testimony, Boyd renewed it once again on the morning testimony commenced before the jury.

■ The granting of a postponement or continuance on account of the sickness of counsel has always been deemed a matter within the discretion of the trial court. *Alexander v. The State*, 4 Tex.App. 261, at 262 (1878). Where denial of a continuance has resulted in representation by counsel who was not prepared, or denial of representation by counsel altogether, through no fault of the accused, this Court has not hesitated to declare an abuse of discretion. *Daughtery v. State*, 33 Tex.Cr.R. 173, 26 S.W. 60 (1894); *Kuehn v. State*, 47 Tex. Cr.R. 636, 85 S.W. 793 (1905); *Stevens v. State*, 128 Tex.Cr.R. 531, 82 S.W.2d 148 (1935). Cf. *Scott v. State*, 43 Tex.Cr.R. 610, 68 S.W. 171 (1902) (error not to contin-

1. Indeed, the cases in Texas alone are legion. A sampling may be found at 1 Branch's Annotated Penal Code § 363 (2d ed. 1956), at 386, and there are many more. See text, *post* at pp. 372–373.

ue or postpone trial where defendant's only counsel wrongfully arrested after jury impaneled, and defendant forced to trial with unprepared attorney); *Giles v. State*, 109 Tex.Cr.R. 234, 4 S.W.2d 66 (1928) (error to force defendant to trial without counsel rather than grant brief postponement when retained counsel was detained in another court); *Richardson v. State*, 162 Tex.Cr.R. 607, 288 S.W.2d 500 (1956) (error to force defendant to trial with unprepared attorney rather than grant a brief postponement, his counsel of choice having been detained in another court). But where other counsel is available or supplied who appears to be "as conversant with the case as ... original counsel" and "in every respect as capable to manage the defense" of the accused, the Court has been loath to reverse a conviction on the basis of failure to grant a continuance in the absence of original or lead counsel because of illness. *Ryan v. State*, 35 S.W. 288, at 289 (Tex.Cr.App. 1896). See also *Roberts v. State*, 51 S.W. 383 (Tex.Cr.App.1899); *Johnson v. State*, 41 Tex.Cr.R. 9, 51 S.W. 911 (1899); *Coleman v. State*, 43 Tex.Cr.R. 15, 63 S.W. 322 (1901); *Mason v. State*, 81 S.W. 718 (Tex. Cr.App.1904); *Monroe v. State*, 56 Tex. Cr.R. 244, 119 S.W. 1146 (1909); *Heidingsfelder v. State*, 128 Tex.Cr.R. 351, 81 S.W.2d 510 (1935); *Kerr v. State*, 134 Tex. Cr.R. 368, 115 S.W.2d 672 (1938); *Lane v. State*, 162 Tex.Cr.R. 305, 284 S.W.2d 723 (1955); *McKnight v. State*, 432 S.W.2d 69 (Tex.Cr.App.1968); *Miller v. State*, 537 S.W.2d 725 (Tex.Cr.App.1976). Failure to grant a motion for continuance where lead counsel has been debilitated does not amount to an abuse of discretion, even if associate counsel "was not as familiar with the case as his leading counsel[,]" at least where the "record shows nothing that could have been done for appellant that was not properly done by counsel who managed the case during trial." *Webb v. State*, 40 S.W. 989, at 990 (Tex.Cr.App.1897).

Appellant leans heavily upon this Court's opinion in *Stearnes v. Clinton*, 780 S.W.2d

216 (Tex.Cr.App.1989). In *Stearnes* we held unanimously that a trial judge does not have authority to remove an attorney it has appointed to an indigent defendant "at his discretionary whim." *Id.*, at 223. We relied in large part on the opinion of the Supreme Court of California in *Smith v. Superior Court of Los Angeles County*, 68 Cal.2d 547, 68 Cal.Rptr. 1, 440 P.2d 65 (1968). Appellant quotes the passage from *Smith* that we found significant in *Stearnes, viz:*

"All will agree that if the defendant's attorney exhibits objective evidence of *physical incapacity*[2] to proceed with a meaningful defense of his client, such as illness, intoxication, or a nervous breakdown [citation omitted], the court need not sit idly by; it should inquire into the matter on its own motion, and if necessary relieve the affected counsel and order a substitution. Yet even that action should be taken with great circumspection and only after *all reasonable alternatives, such as granting a continuance,* have been exhausted. Failure to observe these standards, although in a case of undisputed physical incapacity of counsel, will compel a reversal of the ensuing judgment; and this result will follow regardless of whether the defendant's substituted counsel was competent or whether the defendant received a 'fair trial' with respect to the guilt-determining process. (People v. Crovedi (1966) 65 Cal.2d 199, 53 Cal.Rptr. 284, 417 P.2d 868.) The value in issue, we said in *Crovedi*, is 'the state's duty to refrain from *unreasonable* interference with the individual's desire to defend himself in whatever manner he deems best, using every legitimate resource at his command.' (Id. 65 Cal.2d at p. 206, 53 Cal.Rptr. at p. 289, 417 P.2d at p. 873.)"

By this authority appellant argues he has been denied his right to retain counsel of his choice and establish an attorney client relationship.[3] See also *Ex parte Prejean*,

---

**2.** Emphasis in the original *Smith* opinion. All other emphasis in this quote and throughout the remainder of this opinion is supplied unless otherwise indicated.

**3.** Appellant invokes no constitutional provision, either state or federal, for this proposition. *Smith*, however, cites *Crovedi*, which in turn relies upon United States Supreme Court case-

625 S.W.2d 731 (Tex.Cr.App.1981). He maintains that denial of this right entitles him to a new trial irrespective of the competence of the attorney who ultimately represented him or the fairness of the proceeding.

■ In our view, however, appellant's analysis begs the question whether on the facts of a particular case the granting of a continuance is indeed a "reasonable alternative." *Smith,* supra. The right to counsel of one's choice is not absolute,[4] and may under some circumstances be forced to bow to "the general interest in the prompt and efficient administration of justice." *Gandy v. Alabama,* 569 F.2d 1318, at 1323 (CA5 1978). The United States Supreme Court has observed that the question of whether or not to grant a continuance:

"is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly the reasons presented to the trial judge at the time the request is denied. [citations omitted]"

*Ungar v. Sarafite,* 376 U.S. 575, at 589, 84 S.Ct. 841, at 849–850, 11 L.Ed.2d 921, at

931 (1964). In *Ex parte Windham,* 634 S.W.2d 718, at 720 (Tex.Cr.App.1982), this Court gleaned from federal precedent some of the considerations that should inform the trial court's decision whether to grant a continuance on account of the absence of counsel of defendant's choice:

"While not a complete listing, some of the factors include the following: (1) the length of delay requested, (2) whether other continuances were requested and whether they were denied or granted, (3) the length of time in which the accused's counsel had to prepare for trial, (4) whether another competent attorney was prepared to try the case, (5) the balanced convenience or inconvenience to the witnesses, the opposing counsel, and the trial court, (6) whether the delay is for legitimate or contrived ·reasons, (7) whether the case was complex or simple, (8) whether the denial of the motion resulted in some identifiable harm to the defendant, (9) the quality of legal representation actually provided. United States v. Burton, 584 F.2d 485 (D.C.Cir. 1978); Gandy v. Alabama, supra;[5] United States v. Leavitt, 608 F.2d 1290 (9th Cir.1979)."

Considering these factors, under the circumstances as made known to the trial court when it ruled, we do not think it was an abuse of discretion to conclude a continuance was not a reasonable alternative.

■ In his motion for continuance appellant did not ask for any specific length of time, but according to Dr. Rogers' testimo-

---

law construing the Fourteenth Amendment Due Process Clause. See *Avery v. Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); *Chandler v. Fretag,* 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954); *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). See also *Gandy v. Alabama,* 569 F.2d 1318 (CA5 1978).

**4.** Indeed, to the extent that right to counsel of one's choice may be equated with any purported Sixth Amendment right to "a meaningful attorney-client relationship," after its opinion in *Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), it is doubtful the United States Supreme Court would recognize it at all. But see *id.,* 461 U.S. at 20–27, 103 S.Ct. at 1620–24, 75 L.Ed.2d at 625–29 (Brennan, J., concurring).

**5.** In *Gandy* the Fifth Circuit, while recognizing a division of authority among the Courts of Appeals, asserted that, as it pertains to the question whether failure to grant a continuance impermissibly encroached upon the right to counsel of choice, "it is of no relevance that substitute counsel has not been shown to have performed incompetently or ineptly." 569 F.2d at 1326. In any event we will not consider the ninth factor identified in *Windham* in our present analysis. We save our review of Boyd's actual performance for appellant's first and third points of error, see *post,* challenging effectiveness of trial counsel.

ny Scheve would be in no condition to resume the case for at least a month. The record shows that Boyd was substituted as appellant's counsel along with Scheve more than six weeks before voir dire commenced. Although of capital dimension, the case presented no issues of particular complexity, and six weeks should have been ample time to prepare for trial. Boyd conceded that he had read the State's file, and while he did not believe himself to be as familiar with the case as Scheve, he described himself as "pretty familiar" "with the defendant's status and what he wants to do with the case[,]," and "well experienced in the trial of criminal cases[.]" In the time Scheve was present, Boyd conducted the voir dire. For all the trial court could tell, Boyd was adequately prepared to try the case. "If the defendant has other competent counsel prepared to go to trial, then the court, when considering all the factors, need not tolerate as much inconvenience as in the case where the defendant has no other counsel prepared to go to trial." *United States v. Burton*, supra at 498, n. 46. Furthermore, no identifiable prejudice "of a material or substantial nature" was called to the trial court's attention that would likely result from representation by Boyd alone. *Id.*, at 491 & 498.

It is true that several of the *Windham* factors militate in favor of granting the requested continuance. No other continuance had been requested or granted, and the basis of appellant's request was certainly legitimate, not contrived. Because of events he could neither have foreseen nor prevented, he was deprived of his "primary" counsel on the threshold of trial. However, under an abuse of discretion standard it is not our role to reweigh the factors, but to determine whether the trial court could reasonably have balanced them and concluded that the fair and efficient administration of justice weighed more heavily than appellant's right to counsel of

his choice. Under the circumstances of this case we hold that the trial court did not abuse its discretion in failing to grant appellant's requested continuance. Appellant's second point of error is overruled.

■ In his first and third points of error appellant asserts that Boyd rendered him ineffective assistance of counsel.[6] Under both the Sixth Amendment of the United States Constitution and Article I, § 10 of the Texas Constitution, a defendant claiming actual ineffectiveness of counsel in a capital case must establish two prongs. First he must show counsel's actual performance was deficient; that is to say that counsel's performance fell below an objective standard of reasonableness, what is "objective" being a function of prevailing professional norms. Second, he must show that the deficient performance actually prejudiced the defense; that is to say, but for the deficiency there is a reasonable probability that the result of the proceeding would have been different, a "reasonable probability" being one sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State*, 726 S.W.2d 53 (Tex.Cr. App.1986).

■ Appellant contends, however, that because he was deprived of effective counsel by state interference, *viz:* the trial court's denial of his motion for continuance, the "prejudice" prong of the *Strickland/Hernandez* test may be presumed. He relies upon language in *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696, which in turn cites *United States v. Cronic,* 466 U.S. 648, at 659 & n. 25, 104 S.Ct. 2039, at 2047 & n. 25, 80 L.Ed.2d 657, at 668 & n. 25 (1984). But neither *Cronic* nor the cases cited in footnote 25 therein support the conclusion that the legitimate exercise of a trial court's discretion not to

---

6. After this Court granted appellant's out of time appeal in May of 1989, he filed a motion for new trial. A hearing was held on July 6, 1989, and carried over to July 14, 1989. At the end of the hearing the trial court orally denied the motion for new trial. The motion itself does not appear in the record. We do not know for certain, therefore, that the parties joined issue on the question of ineffective assistance of counsel at trial, although it is clear that much of the testimony elicited at the motion for new trial hearing is relevant to such an inquiry. In any event we will address appellant's contentions in the interest of justice.

grant a motion for continuance is of the kind of state action giving rise to a presumption of harmfulness.[7] Indeed, as the Supreme Court made explicit in *Cronic* itself, 466 U.S. at 661, 104 S.Ct. at 2048, 80 L.Ed.2d at 669, it does not invariably follow from a refusal to postpone a criminal trial that an accused has been deprived of the kind of meaningful adversarial testing the Sixth Amendment guarantee of effective counsel demands. We cannot say that "[p]rejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland v. Washington*, 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696. Moreover, the prosecution was not "directly responsible," or even remotely accountable for events precipitating appellant's motion for continuance, such that it would have been "easy for the [State] to prevent." *Id.* We therefore reject the contention that prejudice should be presumed, and will measure appellant's claim of ineffective assistance of counsel against both the deficiency and prejudice prongs of the *Strickland/Hernandez* test.

Appellant alleges that Boyd's assistance was deficient in that it was Scheve, not Boyd, who had been responsible for conducting an independent investigation of the case. He contends that "merely apprising oneself as to the contents of the State's file will not suffice for adequate investigation." Appellant alleges no prejudice at the guilt/innocence phase of trial, however. He points to no fact that additional investigation could have brought to light that would materially have altered the jury's deliberation on the question of his culpability. Our independent review of the record reveals nothing to undermine confidence in the jury's verdict at that stage of the proceedings. We turn, then, to an examination of appellant's contention that Boyd's failure to investigate constituted a deficiency that prejudiced him at the punishment phase of trial. See *Ex parte Walker*, 777 S.W.2d 427, at 430 (Tex.Cr.App.1989).

Appellant claims that Boyd failed adequately to investigate evidence that could have been used to his advantage in mitigation of punishment. Although Boyd called a number of character witnesses, he had failed to interview most of them beforehand, and his examination of each on the witness stand could best be described as perfunctory. Also, Boyd failed to utilize psychiatric testimony to the effect that appellant's conduct in the commission of the offense was not deliberate. Finally, Boyd failed to develop fully evidence to show appellant was intoxicated during commission of the offense.

■ Not every failure to present, or even fully to investigate mitigating evidence constitutes a deficiency in representation. In *Strickland* the Supreme Court reasoned that:

"strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

466 U.S. at 690–91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. The Court later applied this reasoning to hold that a failure "to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment." *Burger v. Kemp*, 483 U.S. 776, at 794, 107 S.Ct. 3114, at 3126, 97 L.Ed.2d 638, at 657 (1987). Boyd's limited use of the character witnesses can be viewed as a reasonable tactical choice.

■ Boyd requested no subpoenas for the punishment phase, relying on appellant's family to round up character witnesses. Even so, over twenty-five character

---

**7.** In each case cited in footnote 25 of *Cronic* a showing of prejudice was pretermitted because "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Appellant does not now contend that he was ever actually or constructively denied counsel at any critical stage of his trial. See *Perry v. Leeke*, 488 U.S. 272, at 280, 109 S.Ct. 594, at 600, 102 L.Ed.2d 624, at 633 (1989).

witnesses testified at the punishment phase, including family, friends, business associates, tenants, and a parish priest. They described appellant as a family man, a hard working businessman, a compassionate landlord and an active and generous member of the church. The witnesses called him "nice," "sincere," and "honorable, reliable, friendly." One witness after another testified appellant was "a good man." An additional nineteen character witnesses were recognized in open court, but did not testify. At a hearing on appellant's motion for new trial it was developed that, other than the priest, Boyd had not interviewed any of these witnesses in any real depth prior to their testifying. By way of testimony and affidavits of many of the same witnesses, plus a few others, appellant was able to develop the same good character traits that Boyd had adduced at trial, only in substantially greater detail. Boyd testified, however, that he had been reluctant to present appellant's character witnesses at all. He explained:

"Q. Did you ever ask any of them about specifically the deeds the defendant had accomplished in his life?

A. No, because the good deeds got in by—

Q. There was no questions about good deeds?

A. It was all superfluous. All these witnesses did not know anything about the circumstances of this crime. They were totally useless in my opinion as witnesses.

Q. Because nobody had ever told them about the circumstances?

A. They didn't know. Nobody interviewed them. Even your affidavits in your motion for new trial, every one of them express surprise that this defendant would go out and do this act. That makes them uncredible [sic] to the jury. Here they are saying this is a good man and he wouldn't commit this type of crime.

Q. Because you and Mr. Scheve hadn't told them?

A. That's right. Maybe that's part of it. I don't know what they would have said. They didn't know. They were perplexed—every one of them.

\* \* \* \* \* \*

Q. ... Now, you also said that you thought it was counter productive to call these witnesses. You may have already answered that question, but let me ask you again. Why in your opinion would it have been counter productive to call these people as witnesses on behalf of Mr. Rosales?

A. ... I have not tried a lot of capital cases. I have seen a lot of them and been to siminars [sic]. I have seen some of the failings and I have a pretty good sense of what works. The biggest problem I see is this: by calling these witnesses you have a whole bunch of witnesses that were going to come in and say we were good friends of Mr. Rosales. We knew he had done all of these good things. We had entrusted things to him and all this sort of thing and all that sort of thing and then that is contrary to say a black defendant out here in the ghetto that's been beaten down all his life and has no friends and then he commits that crime. The problem you have with a jury is a man that all these friends that entrusted him—he violated that trust in such a way and that is why friends supporting him in this case is of little use to the jury because he had violated a trust and they would hang the defendant for doing that. I can't even—you can't even go and say here is a man from an impoverished background that's been kicked down and beat all his life and you should feel sorry for him. \* \* \* It's just that I think you have more trouble with this kind of defendant. When people really have given their trust to him and he has demonstrated that betrayal it's hard to explain to a jury, especially when that betrayal is in such an enormously hurtful way."

We cannot say that the possibility of jury backlash constitutes an unreasonable basis to circumscribe questioning of character witnesses. Appellant presents nothing to "overcome the presumption," apparently honored by the trial court in denying the

motion for new trial, that Boyd's decision was a sound one. *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95; *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).[8]

At any rate, it does not appear that appellant was prejudiced. Though the evidence at the motion for new trial hearing unquestionably renders a more textured portrait of appellant, it is ultimately no different in outline than the picture that was presented at trial. The trial court would have been justified in concluding, consistent with *Strickland* and *Hernandez,* both supra, that Boyd's decision not to elicit character testimony in greater detail did not affect the reliability of the punishment proceeding.

 It was also shown at the hearing on the motion for new trial that appellant's original attorneys had requested and obtained a psychiatric evaluation from Dr. Fred Fason. Fason testified that it was his opinion appellant's "behavior was not deliberate" in committing the instant offense. Appellant had acted out of strong emotion accelerated by alcohol, but was "capable of responding favorably to psychiatric treatment[.]" Fason would have testified to this effect at trial, if called. Appellant now faults Boyd for not putting this testimony before the jury.

Boyd testified that he had talked to Fason either before or during trial on the telephone:

"Q. And would you please tell the Court and for the record your answer as to why you didn't call [Fason] to testify? A. I do not recall exactly. All I could— all I know, and this is the truth about this—all I know is I formed a conclusion that Fason's testimony would have been worthless in this case. I don't know exactly why, but I had talked to him and

I had read his report somewhere. There was something that Fason told me that was so unrealistic that I got particularly upset about what he had told me he was going to testify to. ·

Q. It didn't comport with the facts of this case.

A. I don't remember. Secondly, the reason I didn't do so is there was sort of an implied trade off as I recall. The State didn't call Nottingham [another psychiatrist] and their expert witnesses so we just didn't do it. I have seen a lot of these experts and I am very suspicious of them. I don't think most of them have credibility to a jury's understanding and I went in with a built in hostility to Fason because I just—I think—well, I should not say it but I did have a little hostility towards people like Fason and others that maybe they are right and maybe I am wrong, but I didn't feel comfortable with him and I have seen many of these experts and they just don't go across with the juries and I think the facts of this case spoke so high and I felt my main attention had to be devoted to my final argument in this case and it had to be based on things a jury could sense, not on Fason coming in here and saying the man didn't do it intentionally and things like that.

Q. So, you did not ignore him?

A. I did not ignore Fason, no, sir."

It should be enough to observe that Boyd made a conscious and informed decision not to use Fason's testimony because he wanted to avoid expert rebuttal testimony from the State. See *Darden v. Wainwright,* supra. Particularly if he also believed Fason would not make a compelling, or even a credible witness, Boyd's decision was not "outside the wide range of professionally competent assistance." *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at

---

**8.** At the motion for new trial hearing evidence was adduced from a number of witnesses and by affidavit that appellant was remorseful for his crime. Appellant now assails Boyd for not having presented this evidence at the punishment phase of his trial. Much of this evidence shows expressions of remorse that have occurred since the time of appellant's trial, howev-

er. In fact, only one affiant, appellant's priest, unequivocally states that appellant expressed remorse *prior to trial.* But Boyd testified he had interviewed the priest for forty-five minutes prior to his testifying at the punishment phase. Thus, we do not know that it was for lack of investigation or preparation that Boyd failed to inquire of appellant's remorse at trial.

2066, 80 L.Ed.2d at 695. The trial court could well have concluded that Boyd's performance was not deficient in this respect.

 Finally, appellant complains that Boyd failed to uncover a hospital report documenting appellant's intoxication at the time of the offense. In the course of events appellant himself was shot in the leg, and was taken to the hospital for treatment following his arrest a short time after the offense was committed. As the State points out, however, appellant has not shown that any such hospital report exists. Absent such a showing, we cannot conclude he has been prejudiced. Appellant's first and third points of error are, accordingly, overruled.

 In his fourth point of error appellant asks that we abate the appeal and remand the cause for a hearing consistent with *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, appellant contends the trial court erred in failing to require the State, as per his request, to explain its use of peremptory challenges exercised against Hispanic veniremen. This cause was tried in 1985, before the decision in *Batson* was handed down. On the first day of voir dire seven veniremen were questioned. Two of the seven were Hispanic, and both were peremptorily challenged by the State. At the beginning of the second day, the following colloquy transpired:

"MR. BOYD: Your honor, the other matter I would like to take up with the Court *is the familiar patterns already developing, Your Honor, on the selection of these jurors,* and the State has exercised strikes on two Mexican Americans, one black woman, and I feel that this defendant has *a federal and state constitutional right to a cross section of his peers,* and if the State is going to persist in using their peremptories to eliminate all the minorities, both Mexican Americans and Chicanos and the black people, *this defendant is going to be denied his right to a fair trial by his peers.* My proposal is this—we know the State has a right to peremptory challenges. I think the Court may not favor their striking minorities without reason. I think if in the future the State strikes what is obviously a minority juror, that they state in the record their particular reasons for exercising that peremptory challenge, and I so propose it and request it and move the Court to so follow that procedure.

THE COURT: I will deny your request to have them specify the reason for the exercise of peremptory challenges.

MR. BOYD: May I have a running objection on that?

THE COURT: Yes, sir.

MR. BOYD: May I have in the record, Your Honor, after each juror is selected, that I—and leaves the room, that we state in the record what the race of that juror is, and if there is any problem about it, then we can straighten it out then, if there is any issue of fact as to what color or race that particular juror is, but I would like to have that in the record specifically on the peremptory challenges that State exercises in the future.[9]

THE COURT: Very well...."

We note that appellant's objection appears to have been couched in terms of a purported right to representation of a fair cross section of the community on the petit jury. Such a claim, insofar as it is premised on the Sixth Amendment, has been rejected by the United States Supreme Court and by this Court. *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990); *Seubert v. State,* 787 S.W.2d 68 (Tex.Cr. App.1990). Perhaps for this reason appellant now raises a claim premised on the Equal Protection Clause of the Fourteenth Amendment.[10]

Appellant contends this cause is "controlled by" *Henry v. State,* 729 S.W.2d 732 (Tex.Cr.App.1987). It is true that in *Hen-*

9. Later in the voir dire appellant expressly abandoned this request that the record affirmatively reflect the race of individual veniremen.

10. *Seubert* was decided April 4, 1990. Appellant filed his brief in this appeal on October 22, 1990.

*ry*, also involving a trial that occurred prior to *Batson*, the defendant raised a claim that the State's use of peremptory challenges to strike minority veniremen violated his "right to trial by a cross section of the community." 729 S.W.2d at 733. Without explication, the Court treated this "fair cross section" argument as if it were a *Batson* claim. Since *Henry* was decided, however, we have expressly acknowledged that the Sixth Amendment claim of a right to representative cross section on the petit jury is distinct from the Equal Protection claim embodied in *Batson*. *Seubert v. State*, supra. We have also declined since *Henry* to except *Batson* error from ordinary rules of procedural default. See *Mathews v. State*, 768 S.W.2d 731 (Tex.Cr. App.1989); *Williams v. State*, 773 S.W.2d 525 (Tex.Cr.App.1988).

In *Trevino v. Texas*, —— U.S. ——, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992), the United States Supreme Court held, consistent with its opinion last term in *Ford v. Georgia*, 498 U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991), that federal judicial review of a *Batson* claim is not barred by state procedural default rules bearing on the specificity of objections at trial so long as the accused either invoked *Batson's* Fourteenth Amendment antecedent, *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), or in any event referred to a practice of using peremptory challenges to exclude minority members from jury service "over a long period of time," or "historically and habitually." [11] Here appellant came no closer to invoking *Swain* than to remark preliminarily that "familiar patterns [were] already developing." Even assuming this was sufficient to preserve a Fourteenth Amendment claim, we hold that

appellant received all the relief he requested from the trial court.

Appellant specifically requested that all *future* peremptory challenges by the State against minority veniremen be explained by the prosecutor. He never requested that those peremptories already exercised against Hispanic veniremen be justified. As the State now points out in its brief, the record does not positively establish that any other venireman of Hispanic origin, which is the extent of his complaint on appeal, was in fact peremptorily struck by the State. Accordingly, appellant's fourth point of error is overruled.

 Appellant alleges in his fifth point of error that the trial court erred in failing to submit an instruction that would allow the jury to give mitigating effect to the evidence that he was intoxicated at the time of the offense. At trial appellant requested an instruction in terms of V.T.C.A. Penal Code, §§ 8.01 and 8.04. He concedes on appeal, however, that there was no evidence to show temporary insanity, and that under our caselaw he would therefore not be entitled to the specific instruction he requested. See *Sawyers v. State*, 724 S.W.2d 24, 33 (Tex.Cr.App.1986). He now argues that we should revisit our holding in *Sawyers* in view of the United States Supreme Court's opinion in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

 In essence appellant is raising purported *Penry* error for the first time on appeal. In *Black v. State*, 816 S.W.2d 350 (Tex.Cr.App.1991) (Campbell, J., concurring), a majority of the Court held that failure to object or request an instruction at trial on the basis of alleged *Penry* error does not procedurally bar appellate review.

---

11. Both *Ford v. Georgia*, supra, and *Trevino v. Texas*, supra, were remanded to the respective state courts "for further proceedings not inconsistent with" those opinions. We are frankly puzzled at the remand in *Ford v. Georgia*, supra, and hence in *Trevino* as well. That a state holding that a trial objection is insufficiently specific to meet its own rules governing procedural default is inadequate to bar *federal* judicial review would not seem to require further action at the state court level, other than an analysis for harm, as in *James v. Kentucky*, 466

U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984). See *Henry v. Mississippi*, 379 U.S. 443, at 452–53, 85 S.Ct. 564, at 570, 13 L.Ed.2d 408, at 415–16 (1965). We nevertheless assume here, without deciding, that the remand in both *Ford* and *Trevino* was for a *state* review of the merits of the Fourteenth Amendment question, notwithstanding the state law determination of procedural default. Whatever problems of federalism may be implicated by this understanding of *Ford* and *Trevino*, we need not address them here in view of our disposition *post*.

Subsequently, however, the Court has refused to recognize voluntary intoxication as a circumstance having mitigating significance beyond the scope of the special issues contained in Article 37.071, § (b), supra. See *Ex parte Rogers*, 819 S.W.2d 533 (Tex.Cr.App.1991) (Clinton J., dissenting). Accordingly, appellant's fifth point of error is overruled.

In his sixth point of error appellant contends the evidence is insufficient to support the jury's affirmative answer to the second special issue, whether "there is a probability that [he] would commit criminal acts of violence that would constitute a continuing threat to society[.]" Article 37.071, § (b)(2), supra. At the punishment phase of trial the State established that appellant had been convicted in 1961 of the offense of assault with intent to murder without malice. Details of this offense, for which appellant was placed on probation, were not adduced. It was also shown that between 1970 and 1978 appellant was convicted four times for the offense of driving while intoxicated. The State also reintroduced all evidence admitted at the guilt/innocence phase of trial. The Court has repeatedly held that the circumstances of the offense itself, if "severe enough," may alone sustain an affirmative answer to the second special issue. *Burns v. State*, 761 S.W.2d 353, at 354 (Tex.Cr.App.1988).

The evidence at guilt/innocence shows that appellant was a forty-six year old businessman in Houston. He and his wife of twenty-seven years, Mary Rosales, had six children. In 1984 appellant and his wife began to experience marital difficulties, and in January of 1985, Mary began seeing a twenty-four year old man, Hector Balboa. In February, Mary moved into a trailer she and appellant owned. She began spending some nights with Hector at the home where he lived with his mother and two sisters. In early March Mary sought a divorce. She still saw appellant on a daily basis, however, and conjugal relations between them continued. At one point appellant asked Mary if she was seeing Hector,

with whom he was acquainted, and she admitted that she was.

On Friday, March 29, 1985, Mary agreed to seek marriage counseling with appellant. She had plans to meet Hector that evening, but appellant asked her not to stay out long because he wanted to meet with her later. Mary agreed in order to placate appellant, but ultimately spent the night at Hector's house. Appellant went out that night with a friend, T.J. Tristan, and drank more than "six or eight beers" and part of "a fifth of liquor." He was last seen by Tristan at about 3:00 a.m. on the morning of Saturday, March 30, 1985.

At about 7:00 a.m. appellant telephoned Hector's brother in an effort to find out where Hector lived. He spoke to Hector's niece, who was able to provide him the unlisted telephone number but not the address. He hung up before the girl could bring her father to the phone. Appellant next called Hector's home and spoke to his sister, Patricia Balboa. He told Patricia he was a friend of Hector's who wanted to come visit him sometime, and asked her for directions to the house. She complied. Fifteen minutes later appellant walked into the house with a pistol in his hand. Without a word he walked up to Pete Rodriguez, Patricia's boyfriend, who was watching television on a sofa, and shot him at point blank range in the head, killing him. He then shot Patricia in the chest, crossed the room, and shot her again in the back. Appellant next proceeded to the front bedroom, where fifteen year old Rachel Balboa was asleep. He shot her twice, mortally.[12] He then went to Hector's room and fired through the door, striking Hector twice. Appellant kicked the door open and a struggle ensued, during which both Hector and appellant were shot. Hector fled outside, followed by appellant, who continued to point the pistol at Hector and pull the trigger, though the gun was out of rounds. Appellant then got in his truck and drove away. Hector and Patricia survived. Appellant was indicted for killing Rachel.

In *Keeton v. State*, 724 S.W.2d 58, at 61 (Tex.Cr.App.1987), the Court list-

---

12. Both Patricia and Rachel were pregnant, and engaged to be married.

ed non-exclusive factors to be considered in determining whether a capital defendant will pose a continuing threat to society. They are:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. psychiatric evidence; and

8. character evidence.

Appellant compares the evidence here to that in *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr.App.1987), and *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988), two cases in which this Court held the evidence did not support the jury's affirmative answer to the second special issue. The deception appellant used to ascertain the location of his victims, and the methodical way in which he carried out the shootings, however, show a degree of calculation and forethought not present in either *Beltran* or *Huffman*. The fact that he did not even know three of his victims shows a wanton disregard for human life. The Court has held, moreover, that the number of people killed is a factor the jury can consider in assessing future dangerousness. *Willis v. State*, 785 S.W.2d 378 (Tex.Cr.App.1989); *Moreno v. State*, 721 S.W.2d 295 (Tex.Cr. App.1986).[13]

■ It is true there was no psychiatric testimony of future dangerousness, and that the only character evidence favored appellant. Certainly the undisputed evidence of appellant's marital discord and his possible intoxication at the time of the offense militate against a finding of future

dangerousness. But psychiatric evidence is not essential. *Huffman v. State*, supra, at 224. And evidence of possible intoxication does not dictate that the jury return a negative answer to the second special issue. *Barney v. State*, 698 S.W.2d 114, at 119 (Tex.Cr.App.1985). The same can be said of appellant's distress at his wife's infidelity—particularly where, as here, the vengeance exacted is so random yet methodical. Viewing the evidence in the most favorable light, we cannot say the jury's verdict was irrational. *Burns v. State*, supra. Appellant's sixth point of error is overruled.

■ Lastly, in his seventh point of error appellant argues the trial court erred in overruling his objection to argument at the conclusion of the punishment phase of trial that he contends was a comment on his failure to testify. Specifically, the prosecutor argued:

"Mr. Boyd also told you tht [sic] this defendant got so drunk—so intoxicated that temporarily deranged him one night and I submit to you you didn't even hear a whisper of temporary insanity or temporary derangement—not a single word from the witness stand, and the only person who testified to any intoxication was Mr. Tristan who last saw him at 2:45 in the morning and said he was intoxicated then, but not a word about intoxication at 8:00.

MR. BOYD: Your Honor, excuse me. I object to that as a comment on the failure of the defendant to testify.

THE COURT: Overruled."

Both Hector and Patricia Balboa testified to the events occurring at about 8:00 a.m. on the morning of the offense. Hector and appellant had been involved in a close-quarters struggle. Either of these witnesses might have testified as to appellant's intoxication, *vel non*. Moreover, the police officer who arrested appellant shortly after the offense testified he "did not observe any outward signs of intoxication." On this state of the record the prosecutor's

---

**13.** It is doubtful, however, that appellant could have known two of his victims were pregnant.

Patricia ultimately delivered her baby in October of 1985.

argument was hardly of such a character that the jury would necessarily have taken it to be a comment on appellant's failure to testify. E.g., *Gardner v. State*, 730 S.W.2d 675, at 700 (Tex.Cr.App.1987). "[I]f the language used can be reasonably construed as referring to the appellant's failure to produce evidence other than his own testimony, it is not an improper remark." *Banks v. State*, 643 S.W.2d 129, 135 (Tex.Cr.App.1982). This point of error, also, is overruled.

■■■■ Appellant has filed a pro se supplemental brief raising seven additional points of error. Although he has no absolute right to hybrid representation on appeal, see *Farris v. State*, 819 S.W.2d 490, at 493, n. 1 (Tex.Cr.App.1990), appellant asks us to review his supplemental points of error in any event, as we did in *Santana v. State*, 714 S.W.2d 1, at 15 (Tex.Cr.App.1986). We have done so, and, as in *Santana*, we find them to be meritless.[14]

Accordingly, the judgment of the trial court is affirmed.

MALONEY, J., concurs in the result.

BAIRD, Judge, dissenting.

I believe the majority errs in its treatment of appellant's fourth point of error. *Rosales*, 841 S.W.2d 368 at 379–380.

## I.

As set forth by the majority, appellant objected, during the voir dire process, to the State's use of its peremptory challenges to exclude "both Mexican–Americans and Chicanos and black people" because such action would deprive appellant of his "federal and state constitutional right to a cross section of his peers" and his "right to a fair trial by his peers." The trial court denied appellant's request to have the State specify the reasons for the exercise of its peremptory challenges. *Rosales*, 841 S.W.2d at 379.

Appellant was tried in 1985, prior to the landmark decision of the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Contrary to the majority's assertion, we have, *without exception*, excepted pre-*Batson* cases from our ordinary rules of procedural default.[1] In *Henry v. State*, 729 S.W.2d 732 (Tex.Cr.App.1987), at the conclusion of his voir dire examination, the defendant requested the trial judge instruct the prosecutor not to use peremptory challenges against members of any minority race. *Id.* at 734. After the jury was impaneled and sworn, appellant objected to the State's use of peremptory strikes to eliminate the African–American veniremembers from the jury panel. *Id.* at 735. Although Henry couched his argument in terms of picking "a fair representation of this community," (an objection virtually identical to the objection lodged by appellant) Judge Miller, writing for a unanimous Court, held that because the case was tried before *Batson*, the objection was timely and sufficient because Henry presented "the issue to the trial court." *Id.* at 736. In a later opinion written by Judge Clinton, who today speaks for the majority, we interpreted *Henry* as holding *only* that a defendant need call the issue to the trial judge's attention at "*some* point during the pendency of the trial." *Mathews v. State*, 768 S.W.2d 731, 732 (Tex.Cr.App.1989).

This Court has repeatedly cited *Henry* with approval. Presiding Judge McCor-

---

14. Appellant alleges, *inter alia*, that his evidence of good character traits and intoxication at the time of the offense entitled him to a *Penry* instruction. While he may raise this contention for the first time on appeal, *Black v. State*, supra (Campbell, J., concurring), the Court has held that good character traits such as those presented here are fully covered by the second special issue under Article 37.071, § 2(b), supra. *Ex parte Baldree*, 810 S.W.2d 213 (Tex.Cr.App. 1991). As for appellant's claim of intoxication as a mitigating factor, see our treatment of counsel's fifth point of error, *ante.*

1. The majority states: "We have also declined since *Henry* to except *Batson* error from ordinary rules of procedural default." *Rosales*, 841 S.W.2d at 380. That statement is clearly erroneous. In *DeBlanc v. State*, 732 S.W.2d 640, 642 (Tex.Cr.App.1987), we unanimously held:

> ... Although we caution defense attorneys that such efforts would be inadequate in cases tried after *Batson*, we are compelled by fairness to hold that appellant has properly preserved the issue.

mick, writing for a unanimous Court, relied upon *Henry* in *DeBlanc v. State,* 732 S.W.2d 640 (Tex.Cr.App.1987). Therein, DeBlanc failed to specifically object to the prosecutor's use of peremptory challenges; however, because *DeBlanc* was pending on appeal when *Batson* was decided, this Court applied a relaxed standard for error preservation and concluded that the *Batson* issue was adequately preserved for review. The Court noted:

> Clearly [DeBlanc] did not voice a clear objection to the use of the peremptory strikes by the prosecutor. However, by virtue of his motion to challenge the array and his efforts to point out that the prosecutor was using his peremptories on blacks, it is clear from the record that [DeBlanc] was concerned with the exclusion of blacks from the jury and did present his concerns to the trial judge. Although we caution defense attorneys that such efforts would be inadequate in cases tried after *Batson, we are compelled by fairness to hold that [DeBlanc] has properly preserved the issue.*[2] *Henry v. State,* [729 S.W.2d 732 (Tex.Cr.App.1987)].

*DeBlanc,* 732 S.W.2d at 642.

In *Chambers v. State,* 742 S.W.2d 695 (Tex.Cr.App.1988), Judge Campbell, writing for a unanimous Court, reaffirmed our holding in *Henry.* Therein, Chambers, at his pre-*Batson* trial, preserved his *Batson* claim simply by noting the race of each veniremember and by asking for the State to proffer a race-neutral explanation in each instance where the State challenged an African–American veniremember.

Finally, in *Tompkins v. State,* 774 S.W.2d 195 (Tex.Cr.App.1987), *aff'd* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834, another pre-*Batson* case, we interpreted Tompkins' complaint "that the trial judge erred in overruling his motion to quash the jury ... because the State excluded by peremptory strikes five black venirepersons, thus depriving [Tompkins] of 'his right to a trial by a jury of his peers which was truly representative of a cross-section of the community' " as raising a *Batson* claim. *Tompkins,* 774 S.W.2d at 199.

## II.

In *Trevino v. State,* 815 S.W.2d 592 (Tex.Cr.App.1991), we held, as the majority does today, that Trevino's alleged *Batson* claim sounded too much like a "fair cross section" complaint and overruled Trevino's point of error. *Trevino,* 815 S.W.2d at 598 n. 3. Trevino petitioned the United States Supreme Court for a writ of certiorari. In *Trevino v. Texas,* —— U.S. ——, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992), the Court summarily granted Trevino's petition for a writ of certiorari and reversed our judgment. The Supreme Court held that Trevino's *trial* objection preserved his equal protection *appellate* claim.

> We cannot ignore the fact that were we to hold petitioner had forfeited his equal protection claim by failing to state it with sufficient precision, we would be applying a stricter standard than applied in *Batson* itself. There petitioner had conceded in the state courts that *Swain* foreclosed a direct equal protection claim, and he based his argument on the Sixth Amendment and a provision of the Kentucky Constitution. *Batson v. Kentucky,* 476 U.S., at 83 [106 S.Ct., at 1715]. Yet we treated his allegation of a violation of the Fourteenth Amendment as sufficient to present the question. *Id.,* [476 U.S.] at 84–85, n. 4 [106 S.Ct. at 1716 n. 4]. Because petitioner's case is here on direct review, he is entitled to the rule we announced in *Batson....*

*Trevino v. Texas,* —— U.S. at ——, 112 S.Ct. at 1550.

Today, the majority, though aware of the Supreme Court's decision in *Trevino,* elects to stick its head in the sand and continue on its predetermined course to overrule this point of error. What is particularly disturbing about the majority's approach is that the State does not contend appellant's *Batson* claim is not preserved. Indeed, the State concedes that at the time of appellant's objection, the State had exercised peremptory challenges against two Mexi-

---

**2.** Unless otherwise indicated, all emphasis here-in is supplied by the author.

can–American veniremembers. State's brief pg. 36. The State only argues that appellant's point is without merit because

appellant has not established a prima facie case of purposeful racial discrimination on the part of the trial prosecutors in the exercise of their peremptory challenges, and is therefore, not entitled to a *Batson* hearing. State's brief pg. 37.

In short, the majority advances an argument *not* made by the State and then conveniently ignores that the argument has been expressly rejected by the United States Supreme Court.

The majority misses the issue by holding that appellant's fair cross section objection did not preserve his *Batson* claim for appellate review. As the Supreme Court recognized, Batson himself made a fair cross section argument. How can the majority recognize that Henry raised a similar cross section complaint on appeal and that we treated it as an Equal Protection claim, *Rosales*, 841 S.W.2d at 379–380, and now reject appellant's claim when his objection was virtually identical to the objection lodged in *Henry*? The issue is whether appellant preserved his *Batson* claim for appellate review, i.e., did appellant call the issue to the trial judge's attention at "some point during the pendency of the trial" as required by *Mathews*, supra? The issue is *not* whether appellant is entitled to relief under a Sixth Amendment argument which was rejected in *Holland* and *Seubert*.

The majority, without explanation and in complete defiance of the decision in *Trevino v. Texas*, as well as the prior decisions of this court, holds appellant to a much higher standard than the similarly situated defendants in *Batson, Henry, DeBlanc, Chambers, Tompkins* and *Trevino*. Apparently the majority has decided to take a "wait and see" approach by passing appellant's shuck to the Supreme Court. Consistent with our precedent, this appeal should be abated with instructions to the trial court to conduct further proceedings consistent with *Batson*.

**3.** The majority's disposition of the remaining points of error is premature; therefore, I ex-

With these comments, I respectfully dissent.[3]

MILLER and OVERSTREET, JJ., join this opinion.

press no opinion on the remaining points of error.